In re **PRUDENTIAL LINES, INC.**, Debtor.

**Asbestosis Claimants Represented by Maritime Asbestosis Legal Clinic, Submitter of First Partial Judgment,**

**Lee J. DICOLA, Trustee of the PLI Disbursement Trust, Judgment Creditor,**

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.,** Judgment Debtor.

In re **PRUDENTIAL LINES, INC.**, Debtor.

**Lee J. DICOLA, Trustee of the PLI Disbursement Trust, Judgment Creditor,**

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.,** Judgment Debtor.

Nos. 93 Civ. 1481 (CSH), 93 Civ. 7164 (CSH).

United States District Court, S.D. New York.

July 29, 1994.

Kirlin, Campbell, Meadows & Keating, New York City, Richard H. Brown, Jr., James E. Pratt, for defendant-appellant American S.S. Owners Mut. Protection and Indem. Ass'n, Inc.

Maritime Asbestosis Legal Clinic, A Div. of Jaques Admiralty Law Firm, Detroit, MI, Leonard C. Jaques, Alan Kellman, for intervenors-appellees Asbestosis Claimants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

These two consolidated appeals present another example of the growing number of cases arising from the havoc wrought by asbestos. The appeals seek review of various decisions of Bankruptcy Judge Francis G. Conrad, sitting by designation in the Bankruptcy Court for the Southern District of New York, made during Chapter 11 bankruptcy proceedings. For reasons detailed below, the bankruptcy court's "Memorandum of Decision on Summary Judgment and 11 U.S.C. § 553" and accompanying "Order and Judgment" are affirmed in part and reversed in part, the Order dated August 4, 1993 and the First Partial Judgment are vacated, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

Debtor Prudential Lines, Inc. ("PLI"), a United States shipowning company, consented to an entry of Chapter 11 relief on November 4, 1986. American Steamship Owners Mutual Protection & Indemnity Association, Inc. ("American Club") is a not-for-profit corporation which provides protection and indemnity insurance to its shipowner members. American Club underwrote protection and indemnity ("P & I") policies for PLI ships on an annual basis from 1940 through 1970 and from 1975 through early 1986.

These policies were "assessable" policies, which meant that American Club charged participants premiums based upon the amount necessary to cover claims and related expenses owed in the insurance year. Assessments were levied on participants for a period of several years after the end of an insurance year as necessary to cover the costs of paying claims and related expenses for that particular insurance year. After ten years, when most of the claims for a particular insurance year had been paid, the insurance year was "closed" and a reserve to cover the unpaid claims for that insurance year was transferred to a Reserve Account. Any surplus remaining in the insurance year account was refunded to the participants pro rata according to the premiums each participant paid in the relevant insurance year. Prior to the 1977 insurance year, no additional transfers were made to reserve funds for closed insurance years to cover possible unasserted asbestos claims. PLI paid in full the premiums due and assessments levied for all years in which policies were issued by American Club except for the years 1979, 1983, 1984 and 1985. It is undisputed that asbestotic diseases constitute injuries compensable under the policies.

The Maritime Asbestosis Legal Clinic ("MALC") represents over 5,000 claimants ("Asbestosis Claimants") seeking damages for their alleged exposure to asbestos with resulting injury while serving on PLI ships during one or more of the years in which American Club had issued P & I policies to PLI. With few exceptions, each claimant also served on vessels of other shipowners during their period of exposure to asbestos.

The Second Amended Joint Plan of Reorganization as Modified (the "Plan") was confirmed by the bankruptcy court on October 4, 1990. The Plan, whose confirmation was never appealed by any party, established a PLI Disbursement Trust (the "Trust") to liquidate asbestos-related claims and to enforce the Trust's interests under PLI's numerous insurance policies. Pursuant to its authority under the Plan, on December 14, 1990, the PLI Disbursement Trustee ("Trustee") commenced an adversary proceeding in the bankruptcy court against American Club seeking a declaratory judgment to determine the Trustee's rights under the P & I policies issued by American Club to PLI. The Asbestosis Claimants, represented by MALC, were granted leave by the bankruptcy court

to intervene in that proceeding on February 26, 1991. On April 2, 1991, Judge Conrad signed an order declaring the adversary proceeding to be a "core" proceeding, or in the alternative a "related" proceeding, and denying American Club's motion that he abstain from hearing the matter.

In its "Memorandum of Decision on Summary Judgment and 11 U.S.C. § 553," issued December 10, 1992, the bankruptcy court ruled on the parties' cross-motions for summary judgment in the declaratory judgment action 148 B.R. 730. The bankruptcy court entered a "Final Order and Judgment" on January 10, 1993 implementing the conclusions it had reached in the summary judgment opinion. American Club filed a notice of appeal on March 11, 1993, seeking review of the April 2, 1991 order of Judge Conrad declaring the proceeding to be "core" and refusing to abstain; the December 10, 1992 summary judgment decision; and the January 10, 1993 Final Order and Judgment (the "First Appeal").

In March of 1993, the PLI Disbursement Trustee and MALC entered into a stipulation settling the asbestosis claims by specifying certain fixed amounts to be paid for certain named categories of diseases, and establishing a procedure for the Trustee's payment of the claims. The bankruptcy court "so ordered" the stipulation of settlement on March 9, 1993. American Club did not receive notice of this stipulation until it received the Trustee's initial claim under it, in a letter dated May 25, 1993, seeking reimbursement of over $13,000,000 expended pursuant to the so ordered stipulation. American Club subsequently declined to pay the claims for indemnification asserted by the Trustee. As a result, in an order dated August 4, 1993 and filed on August 9, 1993 ("August 4 Order") upon MALC's motion, the bankruptcy court directed American Club to fully comply with the Bankruptcy Plan and to reimburse the Trustee for sums expended pursuant to the stipulation.

American Club sought leave from this Court to appeal the August 4 Order, arguing that the bankruptcy court lacked jurisdiction to issue the order because it impacted on issues under appeal in this Court. This Court granted American Club's motion for leave to appeal that order in a Memorandum Opinion and Order dated September 27, 1993.

In a hearing held September 2, 1993, on American Club's motion, the bankruptcy court ordered the Trustee to submit to American Club information sufficient to enable American Club to determine the reasonableness of the settlements. On September 21, 1993, before the Trustee had complied with this order, and over American Club's objections, the bankruptcy court entered the First Partial Judgment submitted by MALC requiring payment of $66,160,000 by American Club to the Trustee pursuant to the so ordered stipulation of settlement.

American Club has also appealed this judgment. That appeal, consolidated with the first, seeks review of both the August 4 Order and the First Partial Judgment.

## DISCUSSION

### I. "Core" Proceeding

In *Northern Pipeline v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court held unconstitutional the broad congressional grant of jurisdiction to bankruptcy courts to decide "private rights" matters, such as state breach of contract claims. *Marathon* involved the adjudication in bankruptcy court of a state breach of contract claim based on a pre-petition contract brought by a debtor against a defendant who had not filed a claim with the bankruptcy court. As explicated in a later decision, *Marathon* held "that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584, 105 S.Ct. 3325, 3334, 87 L.Ed.2d 409 (1985).

In response to the Supreme Court's decision in *Marathon,* Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, 28 U.S.C. § 151, restructuring the jurisdiction of the bankruptcy

courts by drawing a distinction between "core" and "non-core" proceedings. Bankruptcy courts now have jurisdiction to adjudicate matters constituting core proceedings pursuant to 28 U.S.C. § 157(b)(1). Although the statute does not define "core," § 157(b)(2) sets forth a non-exclusive list of matters considered to be core. Bankruptcy courts may also hear matters which are not core but are otherwise related to the bankruptcy case. *See* 28 U.S.C. § 157(c)(1). These non-core but "related" matters are also left undefined.

Because the bankruptcy court has jurisdiction to adjudicate both categories of proceedings, the primary consequence of a determination of whether the proceeding is core or non-core in this case is the applicable standard of review on appeal of the bankruptcy court's decision.

■ When adjudicating core matters, the bankruptcy court may issue final orders and judgments, which are subject to appellate review pursuant to Bankruptcy Rule 8013. Under that rule, a district court reviews the bankruptcy court's findings of facts under a "clearly erroneous" standard and his conclusions of law *de novo*. *See Brunner v. New York State Higher Educ. Services,* 831 F.2d 395, 396 (2d Cir.1987); *In re Baker,* 140 B.R. 88, 89 (D.Vt.1992); *IAM v. Eastern Air Lines, Inc.,* 121 B.R. 428, 432 n. 5 (S.D.N.Y. 1990); *In re Int'l Distribution Centers, Inc.,* 103 B.R. 420, 421 (S.D.N.Y.1989); *In re Tavern Motor Inn, Inc.,* 80 B.R. 659, 660 (D.Vt. 1987).

■ In proceedings involving non-core but related matters, the bankruptcy court is not empowered to make any final determinations. § 157(c)(1). Rather, it must submit proposed findings of fact and conclusions of law to the district court. In non-core related proceedings, the district court reviews *de novo* both the factual findings and the legal conclusions of the bankruptcy court. *See* § 157(c)(1); *see also* Bankruptcy Rule 9033(d) (governing review of proposed findings of fact and conclusions of law in non-core proceedings); *IAM v. Eastern Air Lines,* 121 B.R. at 432 n. 5.

Because the standard of review of the bankruptcy court's conclusions of law is *de novo* regardless of the category in which the proceeding falls, the determination whether the proceedings at issue are core or non-core related, has significance only as to the standard of review accorded the bankruptcy court's findings of fact. As noted, if the proceeding is core, findings of fact will not be disturbed unless clearly erroneous, whereas in a non-core related proceeding, the district court reviews factual findings *de novo*.

At a hearing held March 20, 1991, Judge Conrad held that although the matter involved a mixture of core and non-core matters, the core matters predominated, making it "essentially a core proceeding." Record in First Appeal ("R1") at 353. American Club argues that Judge Conrad erred in deciding that the adversary proceeding was a core proceeding. American Club further argues that the proceedings which led to the August 4 Order and the First Partial Judgment against American Club involved the same issues as the adversary proceeding and were therefore non-core proceedings for the same reasons. American Club maintains that because the proceedings were non-core, the bankruptcy court should have abstained from adjudicating the matters. In the alternative, American Club argues that the matters were at most non-core "related" proceedings subject entirely to *de novo* review by this Court.

■ American Club does not appear to argue that the proceedings at issue require application of the mandatory abstention provisions of 28 U.S.C. § 1334(c)(2). Indeed, decisions made under that section are, by the statute's own terms, not subject to appellate review. *See In re Ben Cooper, Inc.,* 924 F.2d 36, 38 (2d Cir.), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991). Rather, American Club contends that the bankruptcy court erred in exercising its discretion not to abstain from hearing the matter pursuant to 28 U.S.C. § 1334(c)(1), which permits a bankruptcy court "to abstain[ ] from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." The bankruptcy court's exercise of discretion pursuant to that subsection is subject to appellate review under

an abuse of discretion standard. *In re Pan American Corp.*, 950 F.2d 839, 844 (2d Cir. 1991).

■ Having reviewed his decision and the applicable law, I conclude that the adversary proceeding seeking declaratory relief was core and that Judge Conrad did not abuse his discretion in declining to abstain from hearing it.

■ A number of factors influence my decision that the proceeding was core, not the least of which is the Second Circuit's decision in *In re St. Clare's Hospital*, 934 F.2d 15, 18 (2d Cir.1991), which I believe is directly applicable to the present case. In that case, the court of appeals upheld, *inter alia*, the bankruptcy court's determination that an adversary proceeding, in which the debtor hospital sought a judgment declaring that its insurer was obligated to defend and indemnify St. Clare's in a medical malpractice action against it, was a core proceeding. The case at bar also involves a declaratory judgment proceeding initiated by the trustee in bankruptcy to resolve issues concerning coverage and indemnification under insurance policies. American Club emphasizes the need for application of predominately state law in urging that the proceeding should have been considered non-core. But, that factor is not determinative. Section 157(b)(3) admonishes that, "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." Moreover, in *In re St. Clare's Hospital*, the proceeding which was held to be core required the bankruptcy court to apply only state law in interpreting the policy provisions.

My conclusion is also influenced by the recognition that the insurance contracts at issue are considered property of the debtor's estate. *See id.* at 18–19; *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 92 (2d Cir.1988); *Tringali v. Hathaway Machinery Co.*, 796 F.2d 553, 560 (1st Cir.1986); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir.), *cert. denied*, 479 U.S. 876, 107

S.Ct. 251, 93 L.Ed.2d 177 (1986). Indeed, a "liability policy of the debtor ... is a valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be ... 'the most important asset of [i.e. the debtor's] estate.' " *A.H. Robins Co.*, 788 F.2d at 1001 (quoting *In re Johns Manville Corp.*, 40 B.R. 219, 229 (S.D.N.Y.1984)) (alteration in *Robins*). The fact that over seven thousand claims potentially covered under those policies have been filed against the PLI estate makes determination of coverage under those policies, and the operation of specific provisions of those policies such as the "pay first" and deductible provisions, essential and inextricably tied to the administration of the estate. The Trustee's having brought the declaratory judgment action, in order to enforce the Trust's interests under the insurance policies, also distinguishes this case from *In re Titan Energy, Inc.*, 837 F.2d 325 (8th Cir.1988), and other cases cited by American Club in which the insurance-related proceeding found to be non-core was initiated either by the insurer against the debtor or between two third-parties to the bankruptcy.

None of the cases cited by American Club in support of its position compels a contrary result. Because this is not a traditional breach of contract action, some of the cited cases (*see e.g. Marathon*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598; *In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir. 1993)) bear scant resemblance to the facts of this case.[1]

Similarly, the several cases cited by American Club which held adversary proceedings involving insurance contracts to be non-core are inapposite. In both *In re R.I. Lithograph Corp.*, 60 B.R. 199 (Bankr.D.R.I.1986), and *In the Matter of Pied Piper Casuals, Inc.*, 65 B.R. 780 (S.D.N.Y.1986), the adversary proceedings held to be non-core involved claims brought by the debtor against the debtor's insurance company for reim-

---

**1.** In *Orion Pictures*, the court held, *inter alia*, that an adversary proceeding in which the debtor alleged the anticipatory breach of a pre-petition contract and sought declaratory relief setting forth the parties' rights and obligations, as well as specific performance and damages, was a non-core proceeding.

bursement of the debtor's *own* losses assertedly covered by the insurance policies. In *R.I. Lithograph,* the debtor filed suit against its insurer in state court, subsequently removed to the bankruptcy court after its bankruptcy petition was filed, seeking compensatory and punitive damages for the insurer's failure to pay for property damage and business interruption resulting from vandalism allegedly covered by the policy. In *Pied Piper,* the debtor's trustee sought to recover against an insurance company in bankruptcy court for alleged theft loss damages it suffered which were assertedly covered under the policy. Our case presents an entirely different situation. Here, the Trustee does not seek damages for losses from property damage or theft which it alleges are covered by the insurance. It has instead, pursuant to the Plan's mandate, brought an action to declare coverage in response to tort claims made against the estate. The insurance coverage issue and the manner in which the "pay first" provision in the P & I policies can be satisfied directly affect the administration of Trust assets and the settling of over 7,000 claims against the estate.

American Club's reliance on *In re Guenther,* 65 B.R. 650 (Bankr.D.Colo.1986), is misplaced. In *Guenther,* the debtor brought an action against its insurer seeking actual and punitive damages alleging that the insurer failed to settle personal injury claims, the resulting judgments having forced the debtor into bankruptcy. Although the insurer had defended the claim in state court and paid the portion of the judgment representing the policy limit, the debtor alleged that the insurer's failure to settle the claim for a much lower amount constituted a bad faith breach of contract, a breach of fiduciary duty, and negligence. The bankruptcy court held that the proceeding was a non-core related proceeding and abstained from hearing it. This case, by contrast, is not a breach of contract claim. Instead, it is an action to declare PLI's rights under the insurance contracts issued by American Club, which, in turn, will determine the administration of over 7,000

claims by asbestosis claimants made upon the estate.

■ As to the proceedings leading to the entry of the August 4 Order and the First Partial Judgment, American Club argues they are non-core because they involve the same issues as the prior declaratory judgment proceeding and because they required Judge Conrad to determine the values of the asbestosis claims. I disagree. The bankruptcy court did not undertake to revisit in those proceedings the issues of coverage which had already been determined. The proceedings' purpose was to compel American Club to comply with the Plan, with the court's previous decision approving the *Liman* arrangement,[2] and with the so ordered stipulation of settlement. Therefore, the proceedings did not involve the same issues as the declaratory judgment proceeding. But because they involved enforcement of the so ordered stipulation of settlement, the Plan, and the prior summary judgment decision of the bankruptcy court, the proceedings are core. *See In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1137 (2d Cir.1987) (proceeding in which debtor sought to enforce rights granted by prior bankruptcy court decision would be considered core) (dictum); *In re L & S Industries, Inc.,* 122 B.R. 987, 992 (Bankr.N.D.Ill.) (action to enforce previous order of court constituted a "matter concerning the administration of the estate" under 28 U.S.C. § 157(b)(2)(A) and was therefore a "core" proceeding), *aff'd* 133 B.R. 119 (N.D.Ill.1991), *aff'd* 989 F.2d 929 (7th Cir. 1993).

As to its contention that the proceedings required Judge Conrad to determine the value of tort claims, American Club's argument lacks merit. Judge Conrad did not "determine" the value of any of the claims in his August 4 Order or in signing the First Partial Judgment. MALC and the Trustee had previously settled those claims and had gone through the *Liman* process of satisfying the "pay first" obligation in the P & I policies.[3]

---

**2.** *See Liman v. American Steamship Owners Mutual Protection and Indemnity Associations,* 299 F.Supp. 106 (S.D.N.Y.), *aff'd* 417 F.2d 627 (2d Cir.1969) (per curiam), *cert. denied,* 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970).

**3.** The operation of the *Liman* process in the case at bar is discussed at pp. 239–42, *infra.*

In the August 4 Order, Judge Conrad held that American Club was obligated to reimburse the Trustee for sums expended pursuant to the settlement and in the manner approved by the court in the summary judgment decision. The First Partial Judgment simply requires American Club to indemnify the Trustee for sums expended pursuant to the "so ordered" March 9, 1993 stipulation settling claims. Neither of these proceedings therefore involved the bankruptcy court's consideration of the value of the claims themselves. In making his decisions, Judge Conrad was concerned solely with ensuring that American Club indemnify the Trustee consistent with the extent of coverage and the manner of satisfying the "pay first" obligation previously determined by the court.

■ As to the abstention issue, I conclude that Judge Conrad properly exercised his discretion not to abstain. Because I have concluded that the proceedings are core, it was clearly proper for the bankruptcy court to adjudicate them. But, even if the proceedings were non-core but related, I conclude that the bankruptcy court's decision not to abstain was proper. In both *A.H. Robins* and *Tringali* the courts determined that the automatic stay provision applied to proceedings involving insurance policy coverage. In *MacArthur* the court held, *inter alia*, that the bankruptcy court had properly exercised jurisdiction over proceedings approving settlements between the debtor and various of its insurance carriers and enjoining all suits against the insurers related to the settled policies. *See* 837 F.2d at 93. In *Robins*, the court held that the debtor was entitled to a preliminary injunction restraining prosecution of products liability actions in state court because the actions might "diminish" the pool of available insurance funds, an important asset of the estate. *See* 788 F.2d at 1008. Although neither of these cases is directly on point, they each demonstrate that because of the significance insurance coverage issues often have in a bankruptcy proceeding, it is proper under certain circumstances for a bankruptcy court to adjudicate such matters.

As stated, the declaratory judgment proceeding at issue in the present case involved determination of the scope of coverage under the insurance policies, the operation of particular policy provisions and the proper method of payment of claims by the Trustee. Considering that thousands of claims have been filed against the estate, coverage of these claims under the policies is clearly a crucial issue in the administration of the estate. As such, and in view of the fact that such policies are undeniably property of the estate, I conclude Judge Conrad did not abuse his discretion in deciding to hear the proceeding.

The holding in *In re Titan Energy, Inc.*, 837 F.2d 325 (8th Cir.1988), cited by American Club, does not alter my conclusion. In that case, a claimant under the debtor's products liability policies filed suit directly against the insurer in state court seeking collection of the policy proceeds. The insurer subsequently brought an action in the bankruptcy court to determine the policies' coverage of that claim. The Eighth Circuit held that the proceeding was a non-core related proceeding, and that the bankruptcy court properly abstained from hearing it.

Several factors distance *Titan* from the case at bar. First, the declaratory judgment action in *Titan* was initiated by the insurer and the trustee expressed no interest in litigating the insurance coverage questions in bankruptcy court. The court of appeals considered that these circumstances weighed in favor of abstention. *Id.* at 332. In this case, by contrast, the declaratory judgment action was an action in which, by commencing the proceeding himself, the Trustee unequivocally demonstrated not only a strong interest in the coverage issues but a preference for having the issues adjudicated in bankruptcy court.

Furthermore, the *Titan* court noted that the resolution of the claims would have had only a "peripheral" impact on the estate, given that the issue involved coverage of a single claim in the amount of $6,000,000. *Id.* Here, over five thousand Asbestosis Claimants have filed over 7,000 claims against the estate totalling many millions of dollars. Thus, with both vastly greater monetary

stakes and number of claimants, the impact of the proceedings on the reorganization in this case is stronger.

Finally, the fact that the debtor was in Chapter 7 rather than Chapter 11 bankruptcy influenced the *Titan* court's decision that abstention was proper. As the court reasoned, "the desire to aid a debtor's reorganization effort provides another strong impetus for courts to exert jurisdiction over a debtor's insurance policies." *Id.* at 331 (footnote omitted). In this case, because PLI is proceeding in Chapter 11 bankruptcy, the bankruptcy court has a reorganization plan to protect; a factor which makes it more appropriate for the bankruptcy court to have retained jurisdiction over the proceeding than it would have been in *Titan*.

## II. *Coverage Allocation*

The issues in this appeal concerning coverage under the P & I policies are complicated by the highly complicated etiology of asbestosis, the disease for which MALC's clients seek recovery against PLI. Asbestosis results from inhalation of asbestos particles over time. It is progressive and cumulative; continuous exposure to and inhalation of asbestos both increases the likelihood of contracting the disease and hastens its arrival. *See J.H. France Refractories Co. v. Allstate Ins. Co.,* 626 A.2d 502, 505 (S.Ct.Pa.1993). Because it can take many years after exposure before the symptoms of asbestosis are manifested, it is extremely difficult to pinpoint the moment at which the injury occurred for purposes of triggering coverage under an insurance policy. But given that tissue damage occurs at the moment of, or shortly after, inhalation of asbestos particles, many courts have found that "injury" occurs at initial exposure to asbestos. *See e.g., Ins. Co. North America v. Forty–Eight Insulations,* 633 F.2d 1212, 1223 (6th Cir.1980), *modified and aff'd on rehearing,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), *reh'g denied,* 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982).

In its summary judgment opinion and subsequent Order and Judgment, the bankruptcy court held that coverage under a P & I policy was "triggered" when a merchant mariner was exposed to asbestos, with accompanying injury-in-fact, while serving on a PLI ship during the period of time covered by the policy.[4] In so doing, the court rejected the "exposure-in-residence" theory urged by MALC. That is to say, the court rejected the theory that as a result of the progressive development of the disease all successive policies following a mariner's exposure are triggered, whether or not the mariner continued to serve on PLI vessels during the periods of those subsequent policies. Under the court's ruling, policies are triggered only if the mariner served on asbestos-infected PLI ships during the period covering that policy. This ruling has not been challenged on appeal.

The bankruptcy court noted that multiple P & I policies (both PLI and non-PLI) may be triggered for some claimants if they worked on more than one asbestos-infected ship in a given insurance year. When coverage under more than one P & I policy is triggered, the issue becomes whether American Club is wholly liable for all of a claimant's injuries resulting from exposure to asbestos on its triggered policy, or whether, as it contends, American Club's liability should be apportioned according to the length of exposure to asbestos of each affected mariner on a PLI vessel relative to his exposure on other vessels during each policy year.

The parties do not cite, and my research has not disclosed, a case squarely addressing the issue of whether an insurer's indemnification of its insured should be reduced in proportion to the injured claimant's exposure to the injury-causing hazardous substance by entities other than the insured. After considering the bankruptcy court's decision and the applicable general law, I reject American Club's allocation argument.

The circumstances presented by this case differ from those in the typical case dealing with apportionment of insurance coverage.

---

4. The parties agree, and the bankruptcy court so held, that New York law applies in interpreting the insurance policies.

Apportionment generally contemplates division of responsibility for payment or indemnification between multiple policies covering the same risk of the same insured over the same or different time periods, whether provided by one or more insurers. *See* 71 N.Y.Jur.2d *Insurance* § 1892 at p. 331 (1989) ("The test to be applied in determining the respective liabilities of concurrent insurers is ... whether the policies insure the same property, the same interest and against the same risk."). In this case, by contrast, the dispute is not over who among numerous of its insurers will indemnify PLI for the sums it must pay to the injured third parties. Rather, PLI's sole insurer for the periods in question seeks to have its liability for indemnifying PLI reduced because the injured third-parties were also exposed to asbestos on ships of other lines over the periods during which the Club's policies were in force. Essentially, then, American Club's request is not for traditional allocation, but to have its own scope of coverage narrowly construed.

As to such a claim, the cases cited by MALC in support of pro rata allocation are inapposite. *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368 (E.D.N.Y.1988), involved the issue of allocation between two consecutive triggered policies possessed by Uniroyal covering injuries to third parties resulting from exposure to Agent Orange it manufactured and delivered to the government. Both policies at issue were provided by the same insurer to the same insured. The court determined that because the "trigger" for liability was delivery of the hazardous substance to the government, each policy would be responsible to cover the settlement payments in proportion to the number of deliveries made during each policy term. The court's conclusion was based in substantial part on the "other insurance" clause in each policy. Pursuant to each "other insurance" clause, each policy was to be considered "excess" insurance if any other insurance covered the same loss. Thus, because under New York law, when two excess insurance policies cover the same loss, pro rata allocation among the policies is required, the court concluded that pro rata allocation was appropriate. *Id.* at 1393.

*Forty–Eight Insulations, supra,* involved circumstances similar to those in *Uniroyal,* except that the triggered consecutive insurance policies were issued to the asbestos manufacturer by different insurers. The court held that allocation among all the insurers based on the length of each insurers' respective coverage was appropriate under the exposure theory of coverage trigger because the cumulative and indivisible nature of the injury renders determination of the precise proportion of the injury occurring during any particular policy period impossible. Because both of these cases addressed the issue of apportionment between policies issued to the same insured, they have limited applicability to the circumstances of this case and are certainly not determinative.

■ Accordingly, to determine this issue of coverage, I must begin with an analysis of the P & I policy terms to ascertain whether anything in the policy requires or permits such a reduction in American Club's liability. Under New York law, an insurance policy is a contract "which, like any other contract, must be construed to effectuate the parties' intent as expressed by their words and purposes." *American Home Prod. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984). "If the words of the contract are unambiguous, establishing only one meaning when read in the context of the entire policy, then a [court] must enforce the plain meaning of the words...." *Id.* However, if a provision is ambiguous, when construing it, "the court must remain as faithful as possible to the clear intent of the parties." *Uniroyal,* 707 F.Supp. at 1377. In this exercise, ambiguous terms should be viewed from the vantage point of the "reasonable expectations and purposes of the ordinary businessman." *Avondale Indus., Inc. v. Travelers Indem. Co.,* 697 F.Supp. 1314, 1319 (S.D.N.Y. 1988), *aff'd,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *see Fried v. North River Ins. Co.,* 710 F.2d 1022, 1025 (4th Cir.1983) (applying New York law); *see Atl. Cement v. Fidelity & Cas. Co. of N.Y.,* 91 A.D.2d 412, 459 N.Y.S.2d 425, 429 (1st Dep't 1983), *aff'd* 63 N.Y.2d 798, 481 N.Y.S.2d 329, 471 N.E.2d 142 (1984). If the intent of the parties is

evident after viewing the contract in its entirety, the court may not rewrite the terms of the policy in an effort to extend coverage out of a desire for an equitable outcome. *Fried v. North River*, 710 F.2d at 1025–26. If the policy terms are ambiguous, the parties should be afforded the opportunity to offer extrinsic evidence as to their intent. *Id.* at 1374. If the extrinsic evidence does not resolve the ambiguity, then the court applies the state law presumption of *contra proferentem*, construing the policy against the insurer.[5] *See Westchester Resco. v. New Eng. Reinsurance Group*, 818 F.2d 2, 3 (2d Cir. 1987) (per curiam); *Uniroyal*, 707 F.Supp. at 1373; *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir.1983).

Under the P & I policies issued to PLI, American Club agreed to:

[I]ndemnify the assured against any loss, damage or expense which the assured shall become liable to pay and shall pay by reason of the fact that the assured is the owner, or operator, manager, charterer, ... of the insured vessel ... and which shall result from the following liabilities, risks, events, occurrences and expenditures:

(1) Liability for ... personal injury ... or illness....

R1 at 230.[6]

Considering the "plain meaning" of policy language, the bankruptcy court concluded that "any loss" requires American Club to indemnify PLI under each triggered P & I policy for the entire injury flowing from a mariner's exposure to asbestos on a PLI ship during any of the triggered policy periods. Allocation among policies of other insurers would be appropriate, Judge Conrad reasoned, only "if evidence presented at trial can

specifically identify and quantify the actual injury sustained during a given policy period relative to other triggered policies." R1 at 675. Judge Conrad expressed doubt, however, as to the possibility that such evidence could be presented.[7] *Id.*

Together with the bankruptcy court, I find nothing in the insurance contract terms providing specifically for the reduction in liability American Club urges. The policies contain no limitation on the phrase "any loss" which would operate to make American Club liable for anything less than the entire loss that PLI becomes liable to pay and does pay, up to stated policy limits. An identical conclusion was reached by the D.C. Circuit in *Keene Corp.*, 667 F.2d at 1050. In *Keene*, several different insurers provided consecutive policies to Keene, an asbestos manufacturer, effective for different periods during the course of workers' exposure to the asbestos. The court held that each of the insurers was liable for indemnifying the manufacturer for the full amount of liability to an injured claimant up to the stated limit of a triggered policy.

Although *Keene*, like *Uniroyal* and *Forty-Eight Insulations*, is not entirely germane because it involved the division of responsibility among insurers of the same insured, its reasoning in construing the indemnification provision of the policies is helpful to my analysis. The relevant indemnification language provided in pertinent part that:

[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury....

*Id.* at 1039 (emphases deleted). The court concluded that "there is *nothing* in the policies that provides for a reduction of the

---

5. It can be argued, as American Club does here, that the rule of *contra proferentem* should not be applied when the insurer is a sophisticated business such as PLI. However, American Club offers, and the Court finds, no case which stands for such an exception to the *contra proferentem* rule.

6. All policies contained substantially identical language insofar as the relevant clauses are concerned.

7. Judge Conrad erroneously concluded that *"Asbestosis Claimants* may select among the trig-

gered policies according to standard joint and several liability practice." R1 at 698, 702 (emphasis added). Since PLI is the Assured, it is PLI's right, not that of the injured third parties, to choose the triggered policy or policies under which it seeks indemnification. *See, e.g., Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1049–1050 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 *reh'g denied*, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982).

insurer's liability if an injury occurs only in part during a policy period." *Id.* at 1048 (emphasis in original). The court reasoned that:

> For an insurer to be only partially liable for an injury that occurred, in part, during its policy period would *deprive* Keene of insurance coverage for which it paid. With each policy, Keene paid for insurance against all liability for bodily injury. The policies do not distinguish between injury that is caused by occurrences that continue to transpire over a long period of time and more common types of injury. Nor do the policies provide that 'injury' must occur *entirely* during the policy period for full indemnity to be provided.

*Id.* at 1049 (emphasis in original); *accord . ACandS, Inc. v. Aetna Cas. and Sur. Co.,* 764 F.2d 968, 974 (3d Cir.1985) (under terms of policy requiring insurer to indemnify insured for "all sums" it became liable to pay, each insurer was fully liable to pay all damages resulting from asbestos-related injury once policy was triggered; it was irrelevant that the injury was caused in part during another policy period); *J.H. France Refractories,* 626 A.2d at 507–508 (following *Keene,* court held that "[u]nder any given policy, the insurer contracted to pay all sums which the insured becomes legally obligated to pay, not merely some pro rata portion thereof").

There is no material difference between the indemnification provision in the *Keene* policy and the one here. The term "any loss" in the P & I policies is analogous to the "all sums" language in the *Keene* policies. Both phrases unambiguously contemplate liability for the whole amount of damages. Moreover, there is no other language in the policy to suggest that PLI expected anything less than complete security for the risk of liability for latent injury of which it could not have been aware when it purchased the policies. That this is true is evident particularly when considering that under the Jones Act,

46 U.S.C. § 688, one of the statutes on which Asbestosis Claimants base their claims, PLI as a tortfeasor can be held jointly and severally liable for the entirety of the damages a seaman sustains, even if PLI's negligence was minimal. *See, e.g., Edmonds v. Compagnie Generale Trans Atlantique,* 443 U.S. 256, 271, 99 S.Ct. 2753, 2762, 61 L.Ed.2d 521 *reh'g denied,* 444 U.S. 889, 100 S.Ct. 194, 62 L.Ed.2d 126 (1979).

Accordingly, I conclude that under the clear and unambiguous terms of the insurance contracts, American Club is obligated to indemnify PLI for the full amount of damages resulting from a mariner's exposure to and inhalation of asbestos on a PLI vessel during the period of a triggered policy, which PLI becomes liable to pay and does pay, up to the stated policy limits.[8]

■ The bankruptcy court rejected American Club's argument, renewed here, that the "Other Insurance" clause contained in the policies supports allocation. That clause provides:

> [American Club] shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Assured is or would be insured under existing insurance.

R1 at 338.

The court interpreted this clause "to refer to concurrent policies that PLI may have carried that also covered losses occurring during the term of a triggered P & I policy" and concluded that, "[t]he clause is therefore inapplicable to other P & I policies issued to insure the same or other vessels during different insurance periods." R1 at 675.

I conclude that Judge Conrad's interpretation of the "other insurance" clause comports with the plain meaning of the provision's language. The clause refers specifically to other insurance of the "Assured". The "Assured" is defined as PLI or its vessels. R1 at 242. Thus, by its clear and unambiguous

---

8. It follows from this holding that allocation will not be permitted even if evidence conclusively quantifies the portion of the injury resulting from exposure on PLI ships, a result which is in any event extremely doubtful. The only reason for which American Club will be absolved of its responsibility to indemnify PLI is if a mariner was never exposed to asbestos on PLI ships during covered periods. Therefore, that portion of Judge Conrad's decision permitting allocation if evidence can establish the actual portion of a mariner's injury sustained from exposure on PLI vessels during a particular policy period, is reversed.

language, the provision applies to limit American Club's liability for loss covered by other insurance of *PLI*. Yet, the Club does not contend that PLI or its vessels had other concurrent insurance which covers the claims asserted against it. Rather, American Club's contention is that because insurance of non-PLI vessels potentially covers the damage sustained by a seaman, the "other insurance" clause thereby limits American Club's liability for indemnifying PLI for the losses it sustains. Essentially, American Club seeks to expand the definition of "Assured" to include entities other than PLI. This interpretation is simply contrary to the plain meaning of the provision's terms. Nothing in the provision purports to limit American Club's indemnification liability because an injured third party could have pursued its claim against another shipowner covered by other insurance.

The interpretation urged by American Club not only contradicts the plain language of the provision, it infuses the term "other insurance" with a meaning completely at odds with its general understanding in the insurance industry. "The term 'other insurance,' in the special sense in which it is used in insurance contracts, describes the situation in which two or more policies of insurance cover the same risk in the name of, or for the benefit of, the same person." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*, § 11.-01, at 431 (6th ed. 1993) (citing cases). "Other insurance" clauses therefore define one insurer's liability vis-a-vis "co-insurers" of the same insured through either concurrent or consecutive policies covering the same risk. *See id.; see also Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 419–20 (2d Cir.1994) (describing the three general types of "other insurance" clauses and their operation). The operation of the clause suggested by American Club deviates substantially from the generally understood significance of "other insurance" clauses and the bankruptcy court correctly rejected it.

## III. *Application of Deductibles*

■ The P & I policies at issue contain a provision for the application of deductibles for personal injury liability indemnification as follows:

(1) ....

(e) Claims hereunder, other than for burial expenses, are subject to a deduction of $—— with respect to each accident or occurrence.

R1 at 231. The policies do not define the terms "claims," "accident," or "occurrence."

The contested issue on appeal is whether American Club is entitled to take one deductible per injured seaman per triggered policy (regardless of the number of PLI vessels on which a particular seaman served during the policy year), as American Club contends, or may take only one deductible per *policy* triggered regardless of the number of injured mariners the policy covers, as MALC argues. The deductibles range from $500 to $1,000 for the policies issued during the 1940's and 1950's, and from $2,500 to $100,000 for policies issued during the 1960's, 1970's and 1980's. Under American Club's position, if the deductible amount is equivalent to or greater than any individual mariner's claim, American Club could avoid indemnification entirely.

In its summary judgment opinion, the bankruptcy court focused on the terms "claims" and "occurrence" in the deductible provision and found both to be unambiguous. Judge Conrad held that " 'claims hereunder' merely mean[s] that the deductible applies to claims filed under that particular P & I policy", R1 at 679, and that because "occurrence" should be defined not by reference to the individual injuries but by the underlying event giving rise to the injuries, the provision requires a deductible to be taken for each underlying event, rather than each claim. R1 at 681. American Club argues that Judge Conrad improperly failed to take into consideration extrinsic evidence of the parties' practice in applying the deductibles. Judge Conrad held that because the deductible clause was unambiguous, he could not look to external circumstances to interpret the provision. R1 at 679.

■ Judge Conrad correctly concluded that the phrase "[c]laims hereunder" in the

context of the deductible provision is unambiguous. A contract provision is ambiguous under New York law if it is reasonably susceptible of more than one meaning, when viewed objectively by a reasonably intelligent person who has examined it in the context of the entire agreement and who is familiar with the customs, terminology, practices and usages in the particular trade or business. *See Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990); *see also U.S. Fire Ins. Co. v. General Reinsurance Corp.,* 949 F.2d 569, 572 (2d Cir.1991). In MALC's view, the phrase operates as a signal indicating that the stated deductible amount applies to claims arising under that particular policy provision, as distinguished from other deductible amounts for claims arising under other provisions of the policy. "Claims" therefore stands independent from the deductible amount, merely introducing the provision which connects the deductible to "each accident or occurrence." In this view, the deduction applies not to each claim but "with respect to each accident or occurrence."

Conversely, American Club argues that the phrase "[c]laims hereunder" is the touchstone for deductible application. In its view, the word "claims" is directly connected to the deductible, such that the deduction applies to each claim filed against PLI by an injured seaman.

American Club's interpretation requires a strained reading of the provision's language. Unlike American Club, I do not find it effortless to conclude that "claims" is directly linked to the deductible application. To begin with, the provision does not specifically state that it applies to "each" claim. "Claims" could signify "all" claims, or the aggregate of claims, just as readily as "each" claim. Yet, it is the latter interpretation that American Club urges is the only reasonable one. If we assume, however, that the parties intended the phrase "[c]laims hereunder" to mean that the deductible applies to each claim filed against PLI, the last phrase of the provision, "with respect to each occurrence or accident," is rendered either superfluous or inconsistent. On the one hand, if the

parties intended the deductible to apply to each *claim,* how could it at the same time apply to each "occurrence", a requirement in the provision that cannot be overlooked? On the other hand, if each "claim" constitutes an "occurrence" such that the two terms are synonymous, what is the necessity for the last phrase of the provision? If the deductible so clearly applies to each "claim", why would not the provision simply end after stating the deductible amount? American Club's interpretation leaves these serious questions unanswered; whereas, the bankruptcy court's view results from a natural reading of the phrase.

For these reasons, I conclude that the only reasonable reading of the phrase "[c]laims hereunder" in the context of the provision is that it is not the axis on which the deductible application turns. Rather, as Judge Conrad determined, it serves as an introductory phrase not directly linked to the application of deductibles. Since the phrase is not reasonably susceptible of more than one interpretation, it is not ambiguous and its clear meaning must be enforced. I conclude therefore that under its clear meaning, the provision requires the deductible to be applied to each "occurrence".[9] Having so concluded, I must now consider the meaning of that term.

As a preliminary matter, I do not agree with Judge Conrad's conclusion that the term "occurrence" is unambiguous. "Occurrence" is not defined in the policy. In the *Scribner–Bantam English Dictionary* (1979), "occurrence" is defined as "(1) act or fact of occurring; (2) happening; event; (3) appearance or presence of some phenomenon at a particular time or place." In the broadest sense of its commonly understood definition, therefore, "occurrence" suggests the presence of the asbestos on board the ships. Under a narrower reading, "occurrence" might mean each individual mariner's exposure to asbestos. Unlike the phrase "claims hereunder", an examination of the term "occurrence" in the context of the deductible provision does not elucidate its meaning. It is therefore not clear to me what "occurrence" means in the

---

**9.** Although the provision states "accident or occurrence", the bankruptcy court and the parties focus on "occurrence" as the pivotal term. So do I.

context of multiple injuries arising from exposure to asbestos. Because either of the above interpretations is reasonable in the context of the provision, I conclude that the term is ambiguous. *Cf. Uniroyal,* 707 F.Supp. at 1382 ("the terms of the definition of 'occurrence' are partly ambiguous: they identify a set of possible occurrences, but give little assistance in selecting the proper item from that set").

In concluding that the term was unambiguous, the bankruptcy court applied the "unfortunate events test" to interpret its meaning. When the terms "accident" or "occurrence" in an insurance contract are left undefined, in analyzing the fair and accurate meaning of the terms, New York law suggests application of the "unfortunate events test". *See Arthur A. Johnson Corp. v. Indemnity Ins. Co.,* 7 N.Y.2d 222, 227–28, 196 N.Y.S.2d 678, 683, 164 N.E.2d 704 (1959); *Hartford Accident & Indemnity Company v. Wesolowski,* 33 N.Y.2d 169, 173, 350 N.Y.S.2d 895, 899, 305 N.E.2d 907 (1973). Under that test, an "accident" or "occurrence" is not equivalent to the injury suffered by each victim. Rather, "accident" and "occurrence" are given their common sense meaning: "an event of an unfortunate character that takes place without one's foresight or expectation." *Id.* The *Uniroyal* court distilled from these decisions the following summary:

All that can surely be drawn from those two cases is that the "unfortunate event" is not the "negligent act or omission" and it is not the injury to each victim. The "unfortunate event" is evidently one of the several happenings, with the exception of the negligent act or omission, which precedes and contributes to the resulting injury.

707 F.Supp. at 1382.

The bankruptcy court applied this test and concluded that the "unfortunate event" for the purpose of defining "occurrence" was the presence of asbestos on board the ship. If no extrinsic evidence had been offered by the parties, this analysis may have been decisive. However, American Club had offered evidence of the conduct of the parties subsequent to the formation of the policies, which it alleges sheds light on the definition the parties intended to place upon the term. The bankruptcy court determined that because the term was unambiguous, it could not consider this extrinsic evidence.

When provisions of an insurance contract are ambiguous, the court may consider extrinsic evidence presented by the parties in order to ascertain their intended meaning. Properly considered extrinsic evidence includes evidence of the parties' practice with respect to the contract after its formation. Indeed, the parties' practical construction should be given "great, if not, controlling weight in the construction of the contract." *Viacom Intern., Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980) (Weinfeld, J.) (citing *Old Colony Trust Co. v. City of Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913)); *accord Ocean Transp. Line v. AM. Philippine Fiber Ind.,* 743 F.2d 85, 91 (2d Cir.1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent."); *Studley v. National Fuel Gas Supply Corp.,* 107 A.D.2d 122, 485 N.Y.S.2d 880, 884 (A.D. 4th Dep't 1985) ("the practical construction put upon a contract by the parties in performing under it is of great importance in determining its meaning"); *Webster's Red Seal v. Gilberton World–Wide,* 67 A.D.2d 339, 415 N.Y.S.2d 229, 230 (A.D. 1st Dep't 1979) (court looked to parties' practical construction of agreement as "persuasive evidence of the agreed intention of the parties"), *aff'd* 53 N.Y.2d 643, 438 N.Y.S.2d 998, 421 N.E.2d 118 (1981).

Thus, it is not only proper for the court to consider evidence of the parties' practical construction, it may place great reliance on it in construing the meaning of the deductible provision.

Having concluded that the term "occurrence" is indeed ambiguous, I further conclude that the bankruptcy court should have considered extrinsic evidence of the parties' practice with respect to the deductible provision.

American Club asserts that in recent years its practice and the practice of its members (including PLI) has been to apply the deduct-

ible to each seaman injured by his exposure to asbestos under a particular triggered policy. MALC does not dispute that with regard to asbestosis claims, the practice of the parties has been to apply one deductible per injured seaman. MALC instead challenges the relevance of that practice in light of the assertedly small number of asbestosis claims involved in proportion to the total number of claims. Moreover, MALC asserts that the practice of the parties is contradictory because with respect to accidents resulting in multiple injuries, American Club has in the past applied one deductible regardless of the total number of claims. MALC First Brief at 15–16.

As to MALC's latter assertion, the only practice of the parties that is relevant to the practical interpretation of the deductible provision is the parties' conduct with respect to asbestosis claims. Given the vast difference between the nature of an injury caused by a spontaneous accident and that caused by years of exposure to asbestos on ships, the parties' practice in applying deductibles in the former category of injuries sheds no clear light on the definition of occurrence when it comes to the latter category.

 The extrinsic evidence submitted to the bankruptcy court by American Club was contained in an affidavit, R1 at 391, and in ¶ 13 of the parties' Agreed Statement of Facts, R1 at 404–05, both setting forth American Club's policy with respect to applying deductibles to asbestotic disease claims. The affidavit's sole reference to PLI is contained in the following sentence: "Members, including Prudential, who have submitted such [asbestotic disease] claims, have been aware of the Club's practice and policy [respecting deductibles] in that regard." R1 at 391. Nor does the Statement of Facts refer specifically to PLI's practice in applying deductibles under the policies. This evidence, therefore, fails to sufficiently detail the *parties' practice*, as distinguished from American Club's *policy*, in applying deductibles. I do not read the relevant cases as permitting a court, in discerning the parties' intent, to give conclusive weight to evidence of only one party's interpretation of the contract, established years after the parties entered into the contract, without evidence that the other party concurred in that interpretation. Although the evidence American Club points to does not necessarily support its contention, American Club has at least put forward the possibility, uncontested by MALC, that such a practice between the parties occurred.

 A decision on summary judgment is appropriate under New York law where the extrinsic evidence offered to provide evidence of the parties' intent regarding an ambiguous term is immaterial or fails to raise an issue of credibility or a choice among reasonable inferences. See *Wesolowski*, 33 N.Y.2d at 172, 350 N.Y.S.2d at 898, 305 N.E.2d at 909–10; *Uniroyal*, 707 F.Supp. at 1373; *Alfin, Inc. v. Pacific Ins. Co.*, 735 F.Supp. 115, 118 (S.D.N.Y.1990). However, when a reviewing court determines that a provision is ambiguous and that extrinsic evidence may more fully disclose the parties' intent, the court should remand the case to the trial court for "any necessary consideration and findings" unless all extrinsic evidence on the issue has already been presented to the trial court. *U.S. Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d at 574.

I think the case at bar falls within the latter rule. It is unclear on the present record whether all extrinsic evidence relating to the parties' course of dealing with respect to applying deductibles to claims arising from exposure to asbestos has been presented. Accordingly, the case will be remanded to the bankruptcy court to consider any additional extrinsic evidence on the issue. If extrinsic evidence does not resolve the question, application of the *contra proferentem* rule will.

IV. *"Liman" Recycling Issue*

 As the phrase implies, "Payment & Indemnification" policies require the insured to first pay a claimant before the insurers's duty to indemnify the insured arises. The policies involved in this case are no exception, as Judge Conrad held. Because the PLI Disbursement Trust has insufficient funds to pay the full amount of the settlement to each claimant, the "Second Amended Joint Plan of Reorganization as Modified" provides a method of triggering American Club's duty to indemnify by using the rather

small amount of funds contained in the Trust. Section 4.05.07(a)(ii) of the Plan contains a so-called "Liman" provision which operates to provide to the Trustee a means of satisfying the "pay first" obligation contained in the policies. The provision reads in relevant part as follows:

> [t]he PLI Disbursement Trustee is authorized to enter into arrangements under which in substance the PLI Disbursement Trust pays the Allowed Insured Claim in full in cash; the holder of the Allowed Insured Claim repays in cash the full amount of the Deductible Claim and the Club or other insurer reimburses the PLI Disbursement Trust in cash for the full amount of the Excess Claim (and any previously unreimbursed defense costs in excess of the applicable deductible incurred in connection with liquidation of the Claim); and the holder of the Allowed Insured Claim is given an Allowed Claim in Class 5C in the amount of the Deductible Claim.

R1 at 133.[10] This provision is patterned after the method approved in *Liman v. American Steamship Owners Mutual Protection and Indemnity Associations,* 299 F.Supp. 106 (S.D.N.Y.), *aff'd* 417 F.2d 627 (2d Cir.1969) (per curiam), *cert. denied,* 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970). In *Liman,* the court held that an insurer was obligated to indemnify a bankruptcy trustee who settled tort claims against the estate by paying the entire amount of the claims subject to the claimant repaying the bankruptcy estate $1,000 (representing the deductible) in exchange for a general claim against the estate.

American Club urged the bankruptcy court to hold the Plan provision unenforceable against the P & I policies it provided PLI. In his summary judgment opinion, Judge

Conrad rejected American Club's entreaty and approved the *Liman* provision in the Plan, noting that American Club had not cited "a single valid authority for its position that the 'pay first' provision of an indemnity policy is not satisfied when an insolvent insured borrows funds to make an actual payment." R1 at 689. Accordingly, the court concluded that "[i]f the insured pays the claim, whether with or without funds borrowed from Claimants, it has satisfied the plain language of the policy." *Id.* Under the stipulation of settlement approved by the bankruptcy court on March 9, 1993, the PLI Trust pays each claimant the entire amount of the claim subject to the claimant lending back to the Trust a sum up to and including the entire amount of the claim, to be repaid by the Trust after American Club indemnifies PLI. *See* ¶¶ 11 and 12 of the so ordered stipulation, R2 at 5–6. While this recycling of funds appears to be of broader scope than that contemplated in § 4.05.07(a)(ii) of the Plan, quoted *supra,* it is the practice established by the so ordered stipulation, and its propriety is challenged on appeal.[11]

On appeal, American Club launches a twofold attack on the *Liman* arrangement. Initially, it argues that the procedure is impermissible as it applies to American Club's P & I policies because *Liman* was wrongly decided. American Club asserts that *Liman,* resting on questionable reasoning, establishes an arrangement by which an insured's obligation to "pay first" becomes illusory, in derogation of the policy. But the Second Circuit affirmed *Liman.*

Recognizing that this Court has no power to overturn *Liman,* American Club next argues that the decision should be limited strictly to its facts and not applied to the case at bar.[12]

---

**10.** The sum of $300,000 has been placed in the Trust for the purpose of satisfying claims under this arrangement.

**11.** This recycling of claim payments has already been implemented with respect to many of the MALC claimants, resulting in the First Partial Judgment amount of $66,160,000.

**12.** Citing Bankruptcy Rule 3020(b)(1), MALC argues that because American Club did not appeal the confirmation of the Plan, it has effectively

waived any objections to the *Liman* provision. I disagree. The Plan merely authorizes the Trustee to enter into certain arrangements in order to trigger indemnification under its P & I policies. As the bankruptcy court properly held, the Plan did not alter the contractual obligations between American Club and PLI under the policies. Accordingly, even though the Plan permits various arrangements to be made by the Trustee, the arrangements must still comport with the terms

In *Liman,* District Judge Mansfield (as he then was) reasoned that because the claimant became a creditor of the estate in the amount of the deductible, the insured had in good faith sustained an actual loss for which indemnification should be made. *Id.* at 109. The *Liman* court further reasoned that to allow an insurer to "avoid making reimbursement simply on the ground that the Trustee had not ultimately paid the [amount] out of its own pocket, the result would indeed be to 'permit the insurer to take advantage of the financial status of its insured and deprive the ultimate beneficiary claimant of his judgment.'" *Id.* (quoting *Henegan v. Merchants Mutual Insurance Co.,* 31 A.D.2d 12, 294 N.Y.S.2d 547 (1st Dep't 1968)). MALC argues that this reasoning lends approval to the recycling procedure in the case at bar. I disagree.

Although this language at first blush appears to confer broad approval upon the triggering of indemnification by any financing arrangement, a careful analysis of *Liman* demonstrates that its holding does not endorse the sort of arrangement contemplated here. Because I conclude that the *Liman* holding is limited to the specific circumstances of that case and because I have found no case permitting satisfaction of a "pay first" provision in a P & I policy by paying the entire claim to a claimant who then lends the entire amount (or a substantial part thereof) back to the insured, subject to repayment only when the insured is indemnified, I conclude that the arrangement approved in the stipulation does not trigger American Club's obligation to indemnify.[13]

The operation of the indemnification arrangement and the reason for it in *Liman,* are in crucial respects different from the procedure contemplated here. In *Liman,* only the portion of the claim which represented the amount of the *deductible* was financed. The court emphasized that the debtor paid out of its own funds, without resort to borrowing from the claimant, the entire amount for which it would be reimbursed, namely, the claim minus the deductible. Indeed, the *Liman* court distinguished at least one case cited by the insured on that basis. *Id.* at 110. Although the court held that the insurer should not concern itself with the source of the insured's funding, the court reasoned that this was because the sole amount financed represented the deductible and the insured "is not required to reimburse the estate for losses [less than the deductible amount] suffered by the claimants." *Id.* at 110. The court's reasoning was significantly influenced by the debtor's having paid, without any financing, the entire amount of the reimbursable claim, which it concluded was the only amount with which the insurer should be concerned.

I cannot derive a similar comfort from the arrangement here. In this case, the PLI Disbursement Trust will finance not only the deductible, but the entire amount of the claims for which it seeks to be reimbursed. As this amount must be above and beyond the deductible amount, I cannot disregard American Club's concerns about the source of the funds, as the court could in *Liman,* and the legitimacy of the estate's loss.

Moreover, despite the *Liman* court's broad language regarding the insurer taking advantage of the financial position of the insured, the court's concern was clearly in preventing the insurer from escaping its liability to indemnify merely because the insured was unable, owing to bankruptcy complications discussed *infra,* to pay out of its own funds "the

of the policies in order for indemnification to occur.

13. To the extent section 4.05.07(a)(i) of the Plan authorizes the financing of the deductible amount alone, I hold that such an arrangement triggers the indemnification obligation contained in the P & I policies, for the reasons stated in *Liman.* American Club argues that because no specific premiums or assessments were paid prior to the 1977 insurance year to cover loss as a result of asbestos exposure, American Club would be receiving no "windfall" if it failed to indemnify PLI for the asbestos losses under the recycling arrangements and, therefore, the *Liman* reasoning should not apply here. This argument is without merit. American Club does not claim that the policies prior to the 1977 year do not *cover* asbestos claims. PLI paid substantial premiums and assessments for those years covering risk of personal injury. Accordingly, American Club did receive premiums for PLI during those years and the rationale of *Liman* continues to apply.

relatively few thousand dollars required to satisfy defendant's concept that the assured must 'absorb' the deductible." *Id.* at 108. Thus, in reaching its decision the court carefully weighed the consequences of financing only the deductible, not the entire claim. As such, the decision, despite its broad language, does not analyze and offer authority for the financing of entire claims greater than the deductible amount, as PLI seeks to do here.

Furthermore, the endorsed necessity for "borrowing" the deductible funds in *Liman* differs significantly from the need for financing the payments here. In *Liman,* the debtor's estate could not be permitted to pay the amount representing the deductible as it would amount to an illegal preference since the estate would not be reimbursed for that portion of the payment. Thus, even if the estate had the funds with which to pay the deductible, it could not do so except to the detriment of priority creditors. By contrast, PLI's desire to recycle is not significantly motivated by a concern for avoiding illegal preferences. Instead, the asserted necessity for the procedure is merely the Trust's inability to pay the claims without borrowed funds.

Having carefully reviewed *Liman,* I conclude that it does not countenance an arrangement whereby the entire amount of a claim is financed by the recycling procedure provided in the Plan and in the so ordered stipulation.[14] The so ordered stipulation requires the Trust to finance the payment of each claim by paying the amount of the claim to a claimant, who immediately upon receipt, loans a sum up to the entire amount of the claim back to the Trust in exchange for a claim against the estate. I do not agree that the Trust suffers a real loss by such a method of payment. The loan is "non-recourse." And, despite the fact that the claimant may receive a claim against the estate in exchange for the loan representing the amount of the loan in excess of the amount for which PLI is ultimately reimbursed, such claim is insubstantial given that the estate will not have anywhere near the funds necessary to

satisfy even a fraction of those claims. Accordingly, to the extent the Plan and the so ordered stipulation permit an amount greater than the deductible to be financed in this manner, I hold that such method fails to trigger the "pay first" provision in the P & I policies.

## V. *Post–Petition Interest on Past Due Premiums and Assessments*

■ It is undisputed that American Club has a net claim against PLI for $1,270,980 in unpaid premiums and assessments for the years 1979, 1983, 1984, and 1985. PLI has not sought indemnification under any of those policies. Judge Conrad ruled that American Club is permitted under 11 U.S.C. § 553 to offset this amount against sums payable to the Trustee under triggered policies. If American Club chooses to exercise this right to "setoff", Judge Conrad held that the exercise will "resuscitate the Trust's rights to receive contractual benefits under these policies including rights to indemnification for amounts paid to Asbestosis Claimants for personal injuries." R1 at 694, 696. These portions of the bankruptcy court's ruling are not challenged on appeal.

American Club instead appeals the court's denial of its request for post-petition interest on the amount of its "setoff" under § 506(b). The bankruptcy judge denied American Club's request for interest as untimely, holding that the Plan's failure to include such interest should have been raised at or prior to confirmation of the Plan pursuant to Bankruptcy Rule 3020(b)(1) which provides:

[Objections] to confirmation of the plan shall be filed with the court and served on the debtor, the trustee, any committee appointed under the Code and on any other entity designated by the court, within a time fixed by the court.... An objection to confirmation is governed by Rule 9014.

■ American Club argues that the bankruptcy court's refusal to grant interest was erroneous. I disagree. A confirmation of a Chapter 11 bankruptcy plan binds creditors to its terms. "Once a plan is confirmed,

---

**14.** As it presents an entirely different situation, I take no position on the permissibility of triggering indemnification by borrowing funds from third parties other than claimants.

neither a debtor nor a creditor may assert rights that are inconsistent with its provisions." *In re Laing,* 146 B.R. 482, 484 (Bankr.N.D.Okla.1992). In this case, the Plan does not specifically provide for post-petition interest on American Club's setoff claim. Since American Club did not object to the Plan's failure to provide post-petition interest, its post-confirmation request is untimely. *See Matter of Chappell,* 984 F.2d 775 (7th Cir.1993) (post-confirmation and post-discharge request for post-petition interest under § 506(b) by holder of oversecured claim who did not object to plan's failure to provide such interest, was denied as untimely). Accordingly, given its untimeliness, Judge Conrad correctly rejected American Club's application for post-petition interest on its setoff claim.

VI. *Jurisdiction of Bankruptcy Court to Enter August 4 Order and First Partial Judgment*

■ American Club argues that because of this pending appeal the bankruptcy court had no jurisdiction to issue the August 4 Order directing American Club's compliance with the Plan and reimbursement of the Trustee for sums expended in accordance with *Liman,* and the First Partial Judgment ordering American Club to reimburse the Trustee for $66,160,000 expended pursuant to the so ordered stipulation of settlement. Having reviewed the Club's arguments and the governing precedent, I conclude that the bankruptcy court retained jurisdiction to undertake those actions.

■ It is well established that the filing of an appeal divests the lower court of its control over matters on appeal. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 401–02, 74 L.Ed.2d 225 (1982) (per curiam). The same legal principle applies to appeals of bankruptcy court orders. *See Bankruptcy Deskbook,* Harvey M. Lebowitz, Practicing Law Institute (1986) ("The filing of a notice of appeal divests the bankruptcy court of any further jurisdiction over the issues appealed."); *In re Bialac,* 694 F.2d

625, 627 (9th Cir.1982); *In re Neuman,* 67 B.R. 99, 101 (S.D.N.Y.1986); *In the Matter of the Commodore Corp.,* 87 B.R. 62, 63–64 (Bankr.N.D.Ind.1987) (A bankruptcy court has no jurisdiction "to do anything that impacts on any issue or matters under appeal.")

■ This principle is founded upon a concern for ensuring the integrity of the appellate process. To this end, a lower court may take no action which interferes with the appeal process or with the jurisdiction of the appellate court. *See In re Wonder Corporation of America,* 81 B.R. 221, 224 (Bankr. D.Conn.1988); *In re Kendrick Equipment Corp.,* 60 B.R. 356 (Bankr.W.D.Va.1986); *In re Urban Development Limited, Inc.,* 42 B.R. 741, 743 (Bankr.M.D.Fla.1984). It is equally established, however, that while an appeal of an order or judgment is pending, the court retains jurisdiction to implement or enforce the order or judgment. *See e.g. C.H. Sanders Co. v. BHAP Housing Devel. Fund Co.,* 750 F.Supp. 67, 69 (E.D.N.Y.1990). This is true because in implementing an appealed order, the court does not disrupt the appellate process so long as its decision remains intact for the appellate court to review.

■ Courts have accordingly recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or alter it; the former being permissible and the latter prohibited. This distinction was noted by the Sixth Circuit in *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 588 (6th Cir. 1987), which explained it as follows:

[T]he mere pendency of an appeal does not, in itself, disturb the finality of a judgment.... [T]he district Court has jurisdiction to act to enforce its judgment so long as the judgment has not been stayed or superseded.... Although a district court may not alter or enlarge the scope of its judgment pending appeal, it does retain jurisdiction to enforce the judgment.

*See also In re Bencker,* 122 B.R. 506, 510 (Bankr.W.D.Mich.1990) (discussing Sixth Circuit cases); *Becherer v. Merrill Lynch, Pierce, Fenner & Smith,* 809 F.Supp. 1259, 1270 (E.D.Mich.1992) (district court had jurisdiction to issue injunction against relit-

igation of claims in state court despite appeal of the court's judgment on which collateral estoppel was premised; such action would be an enforcement of the judgment, not an expansion of it). The application of this distinction ·is most germane in the context of a Chapter 11 bankruptcy case which involves the court's issuance of innumerable orders involving a myriad of issues, one or more of which may be on appeal at any given moment. Permitting a court to enforce its orders, while prohibiting it from expanding upon them, allows the least disruption of the court's administration of a bankruptcy plan. Thus, it has long been held that in the absence of a stay pending appeal of the plan confirmation, the bankruptcy court is entitled to implement the plan. *See In re Roberts Farms, Inc.*, 652 F.2d 793, 798 (9th Cir.1981); *Matter of Commodore Corp.*, 87 B.R. at 63 (in absence of stay pending appeal of plan, notice of appeal did not deprive bankruptcy court of jurisdiction to make technical modification to plan to permit it to go into effect only if no stay was subsequently issued); *In re AOV Industries, Inc.*, 46 B.R. 190 (D.D.C. 1984) (in absence of stay pending appeal of confirmed plan, bankruptcy judge entitled to implement plan).

This distinction between acts of enforcement and acts of alteration is reinforced by the cases cited by American Club, and those found by this Court, holding that a bankruptcy court lacked jurisdiction to undertake a particular act. In each of the cases, the bankruptcy court either tampered in some manner with the appealed order or sought to make a decision on a contested issue identical to one on appeal. *See e.g. In re Neuman*, 67 B.R. 99, 101 (S.D.N.Y.1986) (bankruptcy court had no jurisdiction to modify appealed order); *Charles & Lillian Brown's Hotel, Inc.*, 93 B.R. 49, 52 (Bankr.S.D.N.Y.1988) (court had no jurisdiction to reconsider order while it was on appeal); *In re Wonder Corp.*, 81 B.R. at 225 (appeal from order granting attorney's fees divested court of jurisdiction to consider motion for sanctions based upon same conduct giving rise to appeal); *Matter of Excavation Construction, Inc.*, 8 B.R. 752, 760 (D.Md.1981) (while order was on appeal, court had no jurisdiction to modify order to

change the date on which debtor's payments were to begin).

The many cases which have determined that a bankruptcy court had jurisdiction to implement an order while it is on appeal lend further support to the significance of this distinction. *See e.g. In re Bencker*, 122 B.R. at 509 (pendency of appeal from prior determination that fire insurance proceeds were property of the estate did not deprive bankruptcy court of jurisdiction to distribute the proceeds); *Matter of Davison*, 95 B.R. 665, 666 (Bankr.W.D.Mo.1988) (bankruptcy court had jurisdiction to enter order distributing funds of estate, including payment of attorney's fees, despite pending appeal from prior order of the court partially denying attorney's fees); *Matter of Cossett*, 51 B.R. 166, 169 (Bankr.S.D.Ohio 1985) (court had jurisdiction to consider both Trustee's motion to effectuate sale of property and debtors' objection to confirmation of the sale, despite pendency of appeal of court's prior order permitting sale of the property).

In its summary judgment opinion and its corresponding January 10, 1993 Order and Judgment, the bankruptcy court held that the *Liman* provision of the Plan was valid and enforceable and that the recycling procedure satisfied the *Liman* provision. The propriety of the bankruptcy court's decision on the *Liman* issue was clearly an issue on appeal in this Court at the time the bankruptcy court issued its August 4, 1993 Order and the First Partial Judgment. The August 4 Order directs American Club to fully comply with the bankruptcy Plan, including the *Liman* provision contained therein. The First Partial Judgment orders American Club to reimburse the Trustee for sums expended pursuant to the so ordered stipulation which embodies the approved *Liman* recycling arrangement. American Club also contends that the other issues on appeal in this Court involving the determination of allocation of coverage and application of deductibles are equally implicated in both Judge Conrad's August 4 Order and the First Partial Judgment.

While the *Liman* issue and other insurance coverage issues may have been implicated in the August 4 Order and the First

Partial Judgment, the merits of those issues were not addressed. The issues were only implicated insofar as necessary to enforce the court's previous decision on summary judgment. Judge Conrad did not revisit the issues; he did not modify, alter or reconsider his decision; he did not reach the merits of the issues. He merely ordered American Club to act in accordance with the terms of the Plan and with his decision. Because Judge Conrad simply enforced his decision and accompanying Order and Judgment, which had not been stayed pending this appeal,[15] his issuance of the August 4 Order and the First Partial Judgment did not frustrate or moot the appeal or have any other impact on the appeal. I conclude, therefore, that the bankruptcy court's actions were not taken without jurisdiction because they were undertaken merely to execute or enforce his decisions which were pending appeal in this Court.

## VII. *Denial of Due Process in the Issuance of the First Partial Judgment*

The last issue on appeal is whether the process by which the First Partial Judgment was reached denied American Club what it terms "due process of law". American Club argues that the bankruptcy court's order that American Club indemnify the Trustee for over sixty-six million dollars violates due process for several reasons: (1) because it had received no notice of the stipulation of settlement between MALC and the Trustee before it was "so ordered"; (2) because it has been given little to no information with which to evaluate the reasonableness of the settlements with claimants; and (3) because no evidentiary hearing on the settlements and indemnification was held before the First Partial Judgment was issued. American Club also argues that it is entitled to discovery regarding the reasonableness of the settlements because the P & I policies require its approval before settlements can be reached.

Because I conclude that American Club is entitled to sufficient discovery to evaluate the reasonableness of the settlements, whether the losses fall within the policies' coverage, and the potential liability of PLI, I vacate the August 4 Order and the First Partial Judgment and remand the case to the bankruptcy court for further proceedings consistent with this opinion.

■ As a preliminary matter, I conclude that the P & I policies do not, as American Club contends, require American Club's approval before PLI may enter into settlements as a prerequisite to its obligation to indemnify. No language in the policies requires American Club's approval of settlements of personal injury claims arising under Paragraph One of the policies. American Club points in vain to two provisions of the contracts in support of its argument. Paragraph 20, entitled "Defense of Claims" provides:

> Whenever required by the Association, the Assured shall aid in securing information and evidence and in obtaining witnesses and shall cooperate with the Association in the defense of any claim or suit or in the appeal from any judgment, in respect of any occurrence as hereinbefore provided.

R1 at 237. Paragraph 21, entitled "Assumed Contractual Liability", provides in relevant part:

> Unless otherwise agreed by endorsement hereon, the Association's liability shall in no event exceed that which would be imposed on the Assured by law in the absence of contract. . . .

*Id.*

I find nothing in either of these provisions which imposes the approval requirement American Club now seeks to establish. The first provision addresses PLI's responsibility to assist in the defense of the action. The second provides that American Club is not liable for indemnifying PLI for a loss arising solely from contractual, rather than legal, liability. Neither of these provisions makes any reference to settlement of claims. Yet, American Club knew how to specifically require prior approval of settlements when it

---

15. The record does not reveal whether American Club sought a stay of the Order and Judgment in the bankruptcy court. It is clear, however, that none was issued by that court and that none was sought or issued by this Court.

so intended. Under Paragraph Three of the provision covering certain losses arising from collision, subdivision (d) provides that:

[T]he Association shall not be liable for any claims hereunder where the various liabilities resulting from such collision, or any of them, have been compromised, settled or adjusted without the written consent of the Association.

No equivalent mandate is provided in the policies with respect to losses arising under Paragraph One. Because I find these provisions to be unambiguous with respect to any requirement for approval of settlements, I need not consider the extrinsic evidence American Club offers on this subject. *See Maryland Casualty Company v. W.R. Grace and Co.*, 23 F.3d 617, 625 (2d Cir.1994) (amended opinion). I conclude, therefore, that the P & I policies do not require that PLI obtain approval of American Club before entering into any settlement of claims for personal injuries purportedly covered by the First Paragraph of the policies.

Although PLI is not required to obtain American Club's approval before settling, it does not automatically follow that American Club is bound to indemnify PLI for any settlement of personal injury claims it enters into. MALC argues that because American Club allegedly refused to defend and/or pay the claims, it is obligated to indemnify PLI for any settlements it reaches. This contention is insupportable. Even when an insurer breaches a duty to defend, the insurer need not indemnify its insured for a settlement which is either unreasonable (*see George Muhlstock v. American Home Assurance*, 117 A.D.2d 117, 502 N.Y.S.2d 174, 180 (A.D. 1st Dep't 1986)), or which covers losses not falling within the ambit of the policy. *See Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 424, 488 N.Y.S.2d 139, 477 N.E.2d 441 (1985). Further, when an insured settles after an insurer declines coverage, "the insured need not establish actual liability to the party with whom it has settled 'so long as * * * a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability

of claimant's success against the [insured].'" *Luria Bros. & Co. v. Alliance Assur. Co., Ltd.*, 780 F.2d 1082, 1091 (2d Cir.1986) (citing *Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir.) *cert. denied*, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963)) (alterations in *Luria*). I see no reason why those principles should not apply to the settlements reached here.

I hold, therefore, that American Club is entitled to discovery sufficient to explore whether the settled losses fall within the scope of the policies' coverage, whether the settlements are reasonable, and whether PLI was potentially liable to each of the claimants. I do not purport to set forth the scope of that discovery except to note that it should include, at the least, the names of the settling seamen, the dates of their service on PLI ships, and the extent of each mariner's injuries. American Club is not required to reimburse the Trustee for settlements paid until it has at least had an opportunity to obtain such discovery and to challenge, if it so chooses, the reasonableness of the settlements.

I further conclude that the bankruptcy court's failure to determine the reasonableness of the settlements, further undermines its orders that American Club indemnify the Trustee for sums expended pursuant the so ordered stipulation of settlement. In bankruptcy cases, the court must approve any settlement of claims against the estate by the debtor as "fair and equitable". *See Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988). The decision to approve settlements lies within the discretion of the bankruptcy court (*see In re Texaco, Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y.1988)), and a decision to approve should not be overturned unless it is a clear abuse of discretion. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir.1992) *cert. dismissed*, ─── U.S. ───, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *In re Purofied Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y.1993).

In setting forth the standards for evaluation of a settlement, the Supreme Court explained that:

There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

390 U.S. at 424, 88 S.Ct. at 1163.

The bankruptcy court is not required to conduct an independent investigation in determining whether a settlement is reasonable; it is entitled to give weight to the informed opinion of the Trustee and counsel that the settlement is fair and equitable. *See In re Purofied Down Products,* 150 B.R. at 522; *In re Carla Leather,* 44 B.R. 457, 466 (Bankr.S.D.N.Y.1984), *aff'd* 50 B.R. 764 (S.D.N.Y.1985). It is not the court's responsibility to conduct a "mini-trial" on the merits in order to assess the reasonableness of the settlement. Rather, the court need only "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.) (quoting *Newman v. Stein,* 464 F.2d 689 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In formulating its independent judgment, the bankruptcy court should consider numerous factors including: (1) the probability of success in the litigation; (2) the difficulties that may be encountered in collection; (3) the complexity of the litigation and the attendant expense, inconvenience, and delay; and (4) the "paramount" interest of the creditors. *See In re Drexel Burnham,* 960 F.2d at 292; *see also In re Purofied Down Products,* 150 B.R. at 522 (citing *Drexel v. Loom-*

*is,* 35 F.2d 800, 806 (8th Cir.1929)); *In re Carla Leather, Inc.,* 44 B.R. at 466.

MALC asserts that Judge Conrad "reviewed and approved" the settlement between the numerous asbestosis claimants it represents and the Trustee on several occasions after it was "so ordered" on March 9; including in the First Partial Judgment on review in this appeal. Yet, on no occasion did the bankruptcy court determine the reasonableness of the settlements in accordance with the standards outlined by the Supreme Court and the Second Circuit. I must therefore remand the case to the bankruptcy court for a statement of reasons for approval of the settlement guided by the above precedents.

### CONCLUSION

The bankruptcy court's "Memorandum of Decision on Summary Judgment and 11 U.S.C. § 553" and its accompanying "Order and Judgment" are affirmed in part and reversed in part; the Order dated August 4, 1993 and the First Partial Judgment entered September 21, 1993 are vacated; and the case is remanded for further proceedings consistent with this opinion.

It is SO ORDERED.