Ezrasons, Inc. v. Travelers Indemnity Co.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2022

(Argued: April 12, 2023      Decided: December 26, 2023)

Docket No. 22-766

_____

Ezrasons, Inc.,

*Plaintiff-Appellant*,

v.

The Travelers Indemnity Co.,

*Defendant-Appellee*.

_____

Before:

LEVAL, CHIN, and NATHAN, *Circuit Judges*.

Plaintiff Ezrasons, Inc. (the "Insured") appeals from the grant of summary judgment by the United States District Court for the Southern District of New York (Lorna G. Schofield, *J*.), in favor of defendant The Travelers Indemnity Company ("Travelers"), the insurer under a marine cargo insurance policy (the "Policy"). The Insured, which is engaged in the garment trade, suffered a loss of insured goods of a value, according to the Insured, exceeding $600,000 while the goods were stored in a warehouse owned and operated by Chamad Warehouse, Inc., in Marion, North Carolina.

1

When the warehouse was consumed by fire on August 14, 2019, Travelers paid $250,000, but declined to pay more based on its contention that the Policy's coverage was limited to $250,000, because the warehouse building where the goods were destroyed was not an "Approved Location" under the Policy. If the warehouse qualified as an "Approved Location," the coverage limit would be $600,000.

Both parties moved for summary judgment. The district court ruled that the warehouse was unambiguously not within the Policy's definition of an "Approved Location." The Court of Appeals finds the Policy ambiguous as to whether the warehouse where the destruction occurred was an "Approved Location." Furthermore, the district court erroneously excluded admissible evidence by which the Insured sought to prove that the warehouse was an "Approved Location." Because the extrinsic evidence available to aid in resolving the ambiguity does not furnish a basis for preferring either possible meaning, New York law dictates that the ambiguity should be resolved in favor of the insured. Judgment VACATED and the matter REMANDED with instructions to enter judgment in favor of the Insured. Costs to the Insured.

> FREDERIC GIORDANO, K&L Gates LLP, Newark, NJ, *for Plaintiff-Appellant*.
>
> CHARLES E. MURPHY, Lennon Murphy Caulfield & Phillips, Southport, CT, *for Defendant-Appellee*.

LEVAL, *Circuit Judge*:

This is an appeal by plaintiff Ezrasons, Inc. (the "Insured") from the grant of summary judgment by the United States District Court for the Southern District of New York (Lorna G. Schofield, *J*.), in favor of defendant

The Travelers Indemnity Company ("Travelers"),[1] the insurer under a marine cargo insurance policy (the "Policy"). The Insured, which is engaged in the garment trade, suffered a loss of insured goods of a value, according to the Insured, exceeding $600,000 while the goods were stored in a warehouse owned and operated by Chamad Warehouse, Inc.,[2] in Marion, North Carolina. The warehouse was consumed by fire on August 14, 2019. Travelers paid the Insured $250,000, but declined to pay more based on its contention that the Policy's coverage was limited to $250,000, because the warehouse building where the goods were destroyed was not an "Approved Location" under the Policy. If the warehouse qualified as an "Approved Location," the coverage limit would be $600,000.

---

[1] Apparently, it is unclear which of the companies within the Travelers complex is the insurer. The company named as defendant in the complaint is The Travelers Indemnity Company. Defendant, however, asserts in its brief that the Insurer is in fact Travelers Property Casualty Company of America. Appellee's Br. at 41. In any event, it appears, at least at this stage, that nothing turns on which of the Travelers companies is party to the contract of insurance. We refer to defendant as "Travelers."

[2] It is not clear whether the name of the warehousing company is "Chamad Warehouse, Inc." or "Chamad, Inc.," *see* App'x at 557, but neither party has raised any argument that would be affected by the difference. We will refer to the company simply as "Chamad."

The Insured brought this action originally in the New York State courts in March 2021 to recover the higher amount. Travelers removed the case to the United States District Court on grounds of diversity of citizenship. 28 U.S.C. § 1441(b). The parties submitted a joint letter to the district court stating their shared belief that the case could "be resolved as a matter of law without need for a factfinder's determination as to material facts . . . [and that it was] appropriate to cross-move for summary judgment without exchanging discovery . . . ." App'x at 374. Both parties then moved for summary judgment. The district court agreed with Travelers and ruled that the warehouse was unambiguously not within the Policy's definition of an "Approved Location."

In our view, the Policy was ambiguous as to whether the warehouse where the destruction occurred was an "Approved Location." Furthermore, the district court erroneously excluded admissible evidence by which the Insured sought to prove that the warehouse was an "Approved Location." Finally, because the extrinsic evidence available to aid in resolving the ambiguity does not furnish a basis for preferring either possible meaning, New York law dictates that the ambiguity should be resolved in favor of the

4

insured. We accordingly vacate the district court's judgment and remand with instructions to enter judgment in favor of the Insured.

## BACKGROUND

Many of the facts are not in dispute. The Policy provided coverage for "goods and/or merchandise while temporarily detained in warehouses and/or processing locations" within the contiguous United States and Canada. App'x at 135, 513. The maximum limit of coverage depended on whether the loss occurred at an "Approved Location." In the part of the Policy where "Approved Locations" were listed, two were specified: One of the two, the pertinent one, was "CHAMAD WAREHOUSE, INC. 371 Branch Street[,] Marion, NC 28752" (with a coverage limit of $600,000). App'x at 137. Under a subsection entitled "Unnamed Domestic Locations," the agreement provided that "goods and/or merchandise in any public warehouse or processing center not listed above" (i.e., not "Approved Locations") will be covered only up to $250,000. App'x at 138.

It is undisputed that "371 Branch Street," the address listed in the Policy as the address of an "Approved Location," was renumbered to "56

5

Branch Street," so that, with the parties' agreement, we read the Policy as if it said "CHAMAD WAREHOUSE, INC., 56 Branch Street."

It is also undisputed that Chamad operates its warehousing business in three warehouse buildings situated on a 19.03-acre parcel of land. Travelers has not rebutted the Insured's evidence that the lot is surrounded by a continuous chain link fence. One side of the irregularly shaped parcel borders Branch Street, where one of its three warehouses with the address 56 Branch Street is located. A second warehouse on the parcel, the one that burned, fronts on Virginia Road. There is evidence that, at least for some purposes, this warehouse was known as 1386 Virginia Road.

The Insured consigned its goods to Chamad for storage. There is no evidence that, prior to the fire, there was any communication between the Insured and Chamad as to which of the three warehouses would be, or was being, used for the storage. The Insured, furthermore, submitted the unrebutted affidavit of Chamad President Steve Guffey, stating that goods entrusted to Chamad are stored in any of the three warehouses. Chamad placed the Insured's goods in the warehouse that fronts on Virginia Road, where they were destroyed by a fire.

6

In presenting and disputing their cross motions for summary judgment, the parties submitted evidence bearing on whether the destroyed warehouse came within the Policy's specification of an "Approved Location." Travelers cited the report of the Marion Fire Department with respect to its response to the fire, stating that the fire occurred at 1386 Virginia Road. It also cited the satellite map maintained by the McDowell County Tax Assessor showing rooftop views of Chamad's 19.03-acre parcel, with street-address numbers added to individual rooftops. On that document, the warehouse fronting on Branch Street has the number "56" superimposed on its rooftop. The warehouse fronting on Virginia Road has the number "1386" superimposed on its rooftop.

The Insured submitted a Deed of Trust by which Chamad had conveyed the 19.03-acre parcel in trust for the benefit of a lending bank, as security for its indebtedness. The deed, naming Chamad as Grantor and giving its address as 56 Branch Street, conveyed to the Trustee all of Grantor's right, title, and interest in the 19.03 acres of "Real Property . . . commonly known as 56 Branch St, Marion, NC 28752" "together with all existing or

7

subsequently erected or affixed buildings . . . ." App'x at 444.[3] In addition, the Insured submitted the sworn declaration of its President Guffey stating that "[t]he Chamad Warehouse is located at 56 Branch Street, Marion, North Carolina."

The district court denied the Insured's motion for summary judgment and granted Travelers' motion. *Ezrasons, Inc. v. Travelers Indem. Co.*, No. 21-3165, 2022 WL 768366 (S.D.N.Y. Mar. 14, 2022). The court reasoned that the fire occurred at 1386 Virginia Road, which unambiguously is not 56 Branch Street.[4] *Id.* at *3. Explaining that the Policy is unambiguous in naming the

---

[3] The Insured also cited newspaper articles that refer to the warehouse fire as taking place at "Chamad Warehouse." App'x at 461–79. Travelers argues that this evidence was inadmissible hearsay. We are inclined to disagree. Hearsay is defined in Rule 801 of the Federal Rules of Evidence as a declarant's statement made otherwise than while testifying in the current trial or hearing, which is offered by a party to prove the truth of what was asserted in the statement. Fed. R. Evid. 801(c). The newspaper evidence was offered not to prove that the warehouse on Virginia Road was owned and operated by Chamad, but to prove that it was known as part of the Chamad Warehouse. In any event, we make no ruling on the question because these newspaper articles play no role in our decision to grant judgment to the Insured. Our reasoning would be the same regardless of whether this evidence had been offered.

[4] The district court's first reason for its judgment was that the "Approved Location" listed in the Policy is 371 Branch Street and neither party contends that the fire occurred at 371 Branch Street. *Id.* at *3. Travelers, however, as noted above, agrees that 371 Branch Street was renumbered to 56 Branch

8

Branch Street address, and not 1386 Viginia Road, as an "Approved

Location," it ruled that the Insured's evidence seeking to show that 56 Branch

Street was the address of all three warehouses must be rejected because it

impermissibly relied on extrinsic or parol evidence to create ambiguity in an

unambiguous agreement. *Id.*

This appeal followed.

## DISCUSSION

### I.   *Standard of review.*

A district court's grant of summary judgment is reviewed by a court of

appeals de novo, "construing the evidence in the light most favorable to the

party against whom summary judgment was granted and drawing all

reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d

157, 164 (2d Cir. 2021) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 168–

69 (2d Cir. 2006)).

Summary judgment should be granted only if "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact

Street and that the Policy should therefore be read as if it said "56 Branch
Street." We accordingly reject that reason for granting judgment to Travelers.

9

"exists and summary judgment is therefore improper 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'" *Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020) (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)). "[S]ummary judgment should usually be denied" if the "resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (quoting *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011)).

When parties cross-move for summary judgment, as done here, each motion is analyzed separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020). "[T]he fact that both sides have moved for summary judgment does not mean that the court" is required to enter judgment "for one side or the other." *Schwabenbauer v. Bd. of Educ. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981); *see also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

II.    *New York law as to ambiguity in insurance policies.*

Under New York law,[5] an insurance policy is a contract, and unambiguous provisions are given their plain and ordinary meaning. *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015). Whether or not a term of a contract is ambiguous is a question of law that is reviewed by the appellate court de novo. *Dish Network Corp.*, 21 F.4th at 212 (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010)); *see also Donohue v. Cuomo*, 38 N.Y.3d 1, 13 (2022).

Ambiguity exists "where [a contract's] terms are subject to more than one reasonable interpretation." *Universal Am. Corp.*, 25 N.Y.3d at 680. "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech . . . ." *Id.* (quoting *Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326–27 (1996)).

---

[5] We apply New York state law to this case because the parties' briefs both assume New York state law governs and such "implied consent is . . . sufficient to establish the applicable choice of law." *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

Ordinarily, in assessing whether a contract is ambiguous, a court looks within only the four corners of the document; extrinsic or parole evidence is usually "not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Donohue*, 38 N.Y.3d at 12–13 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990)). However, contractual ambiguities come in two forms – patent and latent. *See* 2 Couch on Ins. 3d § 21:12. Latent ambiguities present an exception to the rule that courts must look within the four corners of a document to determine ambiguity. "A patent ambiguity appears on the face of the instrument while a latent ambiguity is raised by evidence[.]" *Petrie v. Trs. of Hamilton Coll.*, 158 N.Y. 458, 464 (1899). Latent ambiguities occur when, although the words of the contract appear on their face to have a clear meaning, the evidence shows that they could apply to different facts, objects, or circumstances. *Id.*; *see also Teig v. Suffolk Oral Surgery Assocs.*, 2 A.D.3d 836, 837 (N.Y. 2d Dep't 2003) ("Even where an agreement seems clear on its face, a 'latent ambiguity' may exist by reason of 'the ambiguous or obscure state of extrinsic circumstances to which the words of the instrument refer'" (quoting *Lerner v. Lerner*, 120 A.D.2d 243, 247 (N.Y. 2d Dep't 1986))); *Morgan Stanley Grp. Inc. v. New Eng.*

12

*Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) ("[A] contract may be ambiguous when applied to one set of facts but not another."). If a person contracts for value to bequeath "my house to my daughter," the contract appears to be unambiguous on its face. *See Petrie*, 158 N.Y. at 463. Nonetheless, if application of the terms of the contract to the facts reveals that the person making the commitment had two houses (or two daughters) and nothing in the terms of the contract clarifies which house (or daughter) was intended, the contract presents a latent ambiguity which cannot be interpreted without making resort to extrinsic evidence. *See id.*

An example of latent ambiguity, familiar to many law students, is the story from *Raffles v. Wichelhaus*, [1864] 159 Eng. Rep. 375 (Exch.), of a cargo of cotton contracted to be delivered from Bombay to Liverpool aboard the ship Peerless. When the cargo arrived in Liverpool aboard a ship named Peerless, the consignee refused to accept delivery, contending that the contract called for delivery on board another ship Peerless that had arrived in Liverpool from Bombay two months earlier. *Id.* While the contract appeared

unambiguous on its face, application of its terms to real world facts revealed ambiguity.[6] *Id.*

Interpretation of an unambiguous contract is for the court without a role for the factfinder. *See Universal Am. Corp.*, 25 N.Y.3d at 680. However, if the contract is ambiguous, then relevant extrinsic evidence should be admitted and considered by the factfinder to resolve the ambiguity. *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985); *Dish Network Corp.*, 21 F.4th at 212; *see also In re Van Vliet*, 181 A.D. 879, 880 (N.Y. 2d Dep't 1918), *aff'd* 224 N.Y. 572 (1918) (applying this principle in the context of a latent ambiguity). When the resolution of a contract depends on an ambiguous term or phrase, summary judgment should usually be denied and the ambiguity submitted to the factfinder for resolution by resort to the extrinsic evidence. *Dish Network Corp.*, 21 F.4th at 212. But, "if the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court" and there is no role

---

[6] The court found that mutual mistake between the parties meant there had been no meeting of the minds sufficient to form a contract. Neither party contends that here. Further, adopting such an interpretation here would contravene the policy preferences of New York law to award judgment to the insured in cases such as these. *See, e.g., Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 18 N.Y.3d 642, 646 (2012).

for the factfinder in interpreting the contract. *Home Indem. Co.*, 66 N.Y.2d at 671.

When dealing with insurance policies, it is a "fundamental" principle of New York law that ambiguities should be interpreted against the insurer and in favor of the insured. *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361 (1974); *Int'l Bus. Machs.*, 18 N.Y.3d at 646 (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 353 (1978)). This presumption, however, is used only "as a matter of last resort," after making use of all other available tools to resolve the ambiguity. *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 573 (2d Cir. 1991) (quoting *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983)). When that presumption is invoked by the insured, the insurer bears the burden of showing that the insured's interpretation is unreasonable. *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697–98 (2d Cir. 1998).

We accordingly first determine whether there is an ambiguity, either patent or latent, in the terms of the Policy that prevents deciding the dispute solely on the basis of the terms of the contract without reference to extrinsic factors. If so, we assess whether the parties provided admissible extrinsic evidence that could resolve the ambiguity. If they have not, then New York

law dictates that the ambiguity should be decided in favor of the insured, as a matter of law, provided the insured's interpretation is reasonable. If they have, then we must remand so that the extrinsic evidence may be considered by the factfinder.

III.   *Is the Policy ambiguous?*

Each side contends, in support of its motion for summary judgment, that the Policy unambiguously supports its side of the dispute.

**A**

The Insured contends that, in naming CHAMAD WAREHOUSE, INC., 56 Branch Street as an "Approved Location," the Policy unambiguously so identifies the entire 19.03-acre parcel, including the three warehouses on it. This is for two reasons: First, the "Approved Location" designation gives the company name as its focus. Accordingly what is identified is not merely a single building, but all that is part of Chamad Warehouse, Inc., at 56 Branch Street, which is the entirety of the 19.03-acre parcel. Second, it argues that because the address of the 19.03-acre parcel is 56 Branch Street, so identified by the deed in the public land records, that designation refers to any and all Chamad warehouses on the 19.03 acres.

16

We reject the argument. When one considers that there is a Chamad warehouse that is publicly identified as bearing the address 56 Branch Street, the designation could also be reasonably read to identify only that warehouse as an "Approved Location."

**B**

Travelers similarly contends that the Policy unambiguously names only the warehouse physically located at 56 Branch Street as an "Approved Location," and not the other two warehouses, which are physically located at different parts of the 19.03-acre parcel, and in particular not the warehouse identified in public documents as located at 1386 Virginia Road. It argues that, if the warehouse fronting on Virginia Road is known as 1386 Virginia Road, it cannot also have as an address 56 Branch Street, but cites no rule of law or evidence of usage to support that proposition, especially as to a circumstance where there is evidence reasonably supporting the use of both addresses.

It contends that the term "Location" unambiguously means a single building and not a parcel containing multiple buildings. We find no merit in the argument. The word "Location," without further explanation, does not

17

communicate that it necessarily means a single building, as opposed to two or more buildings on the same parcel of land. Travelers has pointed to nothing in the Policy (or in application documents) specifying that a "Location," as used in the term "Approved Location," must be an individual building and cannot refer to multiple buildings at the same address. While it is true that an address such as 56 Branch Street, particularly in an urban context, often identifies nothing other than a single building, there is nothing unusual, particularly in the case of business companies or other institutions, in the use of a street address to identify an entire campus or parcel that includes multiple buildings. In fact, it is surely often the case that the additional buildings can have no other address (other than a subdivision of the same address) because no other part of the parcel touches on an identifiable street or road. The affidavit of Frank Harten, a Managing Director of Travelers, implicitly acknowledges that it is not unusual that companies in the warehousing business are identified by a single address that includes multiple warehouse buildings. He testified that in such cases, Travelers will "identify each building under the warehouse schedule as 111 Smith Street,

Building #1, 111 Smith Street, Building #2, and 111 Smith Street, Building #3."

App'x at 553.

We can certainly understand why it might be important to an insurer such as Travelers to know exactly which building is being used as the warehouse in deciding whether to insure warehoused goods and on what terms. If the terms of the Policy told the Insured that a "Location" submitted for Travelers' approval must be a single building, and that when insurance is sought classifying multiple buildings as Approved Locations, each building must be separately identified, the inclusion of such terms would likely dispel the ambiguity that inhabits the present Policy. It would be an easy matter for Travelers to insert such a clarifying limitation into the documentation of a policy. But it did not do so. It drafted an ambiguous policy as to the scope of Approved Locations. Upon considering the Insured's evidence, including Chamad's Deed of Trust, which gives Chamad's address and that of the entire 19.03-acre parcel, including the buildings on it, as 56 Branch Street, the Policy can reasonably be read as giving "Approved Location" status to all three warehouses on the parcel located at 56 Branch Street.

19

It is not always easy to distinguish between patent ambiguity and latent ambiguity. While both parties argue that the Policy is patently unambiguous, each undercuts that argument by relying on extrinsic evidence to support its contention about what is meant by its reference to "56 Branch Street." In any event, this case has much in common with the case of the ship Peerless. The words of the contract did not make clear what warehouse or warehouses come within the scope of its reference to 56 Branch Street. When one looks at all of the contextual facts, they could as easily support the Insured's argument as Travelers', and vice versa. By looking solely at the terms of the Policy without reference to external facts, it is not clear whether the pertinent "Approved Location" includes only the warehouse building located at 56 Branch Street, or all three warehouse buildings on the parcel located at 56 Branch Street. By reason of the latent ambiguity, it was error of the district court to decline to consider the extrinsic evidence. When a contract is ambiguous, whether patently or latently, refusal to consider the extrinsic evidence could easily lead a court to construe the contract to mean something that neither side intended at the time of contracting.

20

In support of its decision not to consider the extrinsic evidence, the district court cited the opinion of the New York Court of Appeals in *Donohue v. Cuomo*, 38 N.Y. 3d 1, 13 (2022), for the proposition that that extrinsic evidence "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Ezrasons*, 2022 WL 768366, at *3 (quoting *Donohue*, 38 N.Y.3d at 13). We believe this was an oversimplification and a misinterpretation of the quoted passage from *Donohue*, rendering it misleading. Notwithstanding the ordinary rule that extrinsic evidence cannot be used to vary the terms of a contract whose meaning is clear, it has long been accepted in New York law that an exception to this principle arises in the relatively rare circumstances where the application of the contract terms to the facts encounters a latent ambiguity that leaves the meaning of the contract unclear. *See Petrie*, 158 N.Y. at 463–64. The *Donohue* opinion did not purport to overturn this rule of New York law which is both long established and rooted in logic. The *Donohue* court made no suggestion that the circumstance it dealt with was one of latent ambiguity, such as arises when the meaning of a vital term of the contract cannot be determined because, upon consideration of extrinsic evidence, that term

could refer to one thing or another. An agreement can appear to be "complete and clear and unambiguous on its face," *Ezrasons*, 2022 WL 768366, at *3 (quoting *Donohue*, 38 N.Y.3d at 13), but its apparently clear language may nonetheless conceal a latent ambiguity that becomes apparent when one seeks to apply its terms to the facts. If so, it becomes necessary to consider extrinsic evidence to understand the meaning of the contract. *See Petrie*, 158 N.Y. at 463–64. For these reasons we reject Travelers' argument that the unambiguous terms of the Policy require affirmance of the district court's grant of summary judgment to it.

## C

Travelers further argues that "substantially similar" policy language has been held to unambiguously support Travelers' interpretation by courts within our circuit. Appellee's Br. at 26. We disagree. The cases Travelers cites do not support its argument. In *LaptopPlaza, Inc. v. Starr Indemnity & Liability Co.*, 697 F. App'x 20, 20–21 (2d Cir. 2017) (summary order), this court found that goods stored in a trailer abutting a warehouse were not "detained in warehouses" as required for the policy coverage to attach. In *Royal Insurance Co. of America v. Sportswear Group*, LLC, 85 F. Supp. 2d 275, 277, 280 (S.D.N.Y.

22

2000), the district court for the Southern District of New York similarly found that goods that were stolen while sitting outdoors were not covered by a policy that covered only goods "stored in warehouses." The fact that a separate part of the policy referenced goods stored "at the approved locations" did not negate the policy requirement that goods must be stored "in warehouses." *Id.* at 280–81. We would make the same ruling as made in *Royal Insurance Co.* if the goods in our case had been stored in a truck or on the ground on the Branch Street property, rather than in a warehouse as unambiguously required by this Policy.

Those two cases do nothing for the insurer's argument. They rule merely that a policy's requirement that the covered goods be stored in a warehouse is not satisfied where goods are stored outside of the warehouse.

Nor are we persuaded by the Insurer's citation to *Starr Indemnity & Liability Co. v. Brightside Corp.*, 388 F. Supp. 3d 304, 339–40 (S.D.N.Y. 2019). In that case, the terms of the policy required that approved locations be on the "schedule on file with [the] underwriters." *Id.* at 338. The question was whether coverage extended to new locations of which the insured notified the insurer, but which had not been added by the insurer to the "schedule on file

with [the] underwriters," or included only those which the insurer had added to "the schedule," as the policy specified. *Id.* at 340. The question was answered by the unambiguous terms of the policy, which limited approved locations to those that had been added to the schedule. *Id.* The court ruled that because the policy specified that in order to be covered as approved locations, the locations must be on "the schedule," the insured's mere notification to the insurer of the locations did not make them approved locations. *Id.* The insured's argument, which the court rejected, was akin to our Insured's arguing that a location should be viewed as approved under this Policy merely because the Insured had submitted the location to the Insurer requesting approval. Such an argument has no merit. That case sheds no light on ours. Again, here there is no question that "CHAMAD WAREHOUSE, INC., 56 Branch Street" is properly on the list of Approved Locations. Our question is what that meant.

IV.   *Can the extrinsic evidence submitted by the parties resolve the ambiguity?*

When a contract is ambiguous, we must determine whether extrinsic evidence provided by the parties can resolve the ambiguity. *Home Indem. Co.,* 66 N.Y.2d at 671. If one or both parties offer extrinsic evidence that is capable

24

of resolving the ambiguity as to the meaning of the contract given its bearing on the facts, there is an issue of material fact to be resolved by the factfinder, which will dictate the interpretation of the contract. *Id.* at 671–72. Summary judgment is inappropriate in such a case. If there is no extrinsic evidence available, or the evidence is conclusory or incapable of resolving the ambiguity, then there is no role for the factfinder as to the meaning of the contract. *Id.*

In our case, both parties have offered admissible extrinsic evidence in support of their respective contentions on how the disputed issue of material fact should be resolved.

## A

With regards to the address of the warehouse, Travelers submitted evidence that 56 Branch Street can refer to the warehouse building at that address and that the warehouse destroyed by fire is, at least for some purposes, designated by the address 1386 Virginia Road. The Insured submitted evidence that Chamad's 19.03-acre parcel in its entirety bears the address 56 Branch Street. Neither side, however, has submitted evidence that effectively rebuts the other side's documentary evidence. Addresses do not

necessarily denote only a single building and can be ambiguous in that an address can both describe a single building and a larger plot containing multiple buildings, all of which can have the same address. "Location," the word used in the Policy, is even less precise as to what it does or does not mean. The facts that the building at the Branch Street entrance to the parcel is for some purposes known as 56 Branch Street and that the building destroyed by fire is for some purposes known as 1386 Virginia Road do not rebut the Insured's evidence that the address of the 19.03-acre parcel and all buildings on it is 56 Branch Street. In this case, the aggregate of the extrinsic evidence offered by the parties is incapable of resolving the ambiguity because it furnishes no rational or logical basis for preferring one meaning over the other. A jury deciding the case would not find answers in the parties' extrinsic evidence.

**B**

Travelers next argues that the declarations of Frank Harten are competent extrinsic evidence showing that Travelers did not intend for the warehouse fronting Virginia Road to be part of an "Approved Location," because "Travelers was neither asked to approve the Virginia Road

26

Warehouse nor afforded the opportunity to underwrite that location." App'x at 184. According to Travelers, this extrinsic evidence resolves the ambiguity in its favor.

In his first declaration (dated August 12, 2021), Harten stated that he has "personal knowledge concerning the comprehensive underwriting process performed by Travelers in cases where an insured requests to have specific warehouse locations approved by Travelers and added to a marine cargo policy[.]" App'x at 184. He described the extensive processes by which Travelers "develop[s] rates [for the particular warehouse] based on projections of future losses" by "obtain[ing] data about past losses and then us[ing] probabilities to predict whether future losses will be higher, lower or the same . . . ." App'x at 186. An "essential component" of the process is the receipt of a "COPE" report from ISO (the Insurance Services Office), which furnishes information relating to the "physical **C**onstruction features of the warehouse location . . . , the contents and operations of the **O**ccupancy inside the warehouse location, the public and private fire **P**rotection available . . . , and the **E**xternal exposures adjacent to or nearby to the location." App'x at 186–87 (emphases in original). Travelers also "requests this type of

27

information directly from the insured/its broker, and underwriters will then compare that information against the information that is contained on the ISO Loss Report." App'x at 187. It also collects information by "enter[ing] the Travelers Risk Control Portal to see if Travelers ever inspected the specific warehouse location in the past," and, if so, retrieving the inspection report and providing it to the underwriter. App'x at 187. It will "utilize certain proprietary programs and systems to evaluate flood, wind, and earthquake risks." *Id.* Based on careful evaluation of all this information, it will:

> make a decision if the location is insurable . . . [and] will determine rate/premiums, terms and conditions, deductible and limits . . . [as well as] decide if coverage will be granted for flood, wind and earthquake . . . . The underwriter will view each location separately and may have different rates, terms and conditions or will even exclude flood at one location.

App'x at 187. "Unlike the Virginia Road Warehouse, Travelers was advised about the Branch Street Warehouse which was underwritten per the guidelines above." App'x at 188. He concluded, "The Virginia Road Warehouse was not a location submitted or approved by Travelers, which is why it falls into the classification of an 'Unnamed Domestic Location' which carries a lower insurance limit." App'x at 188.

28

We are not persuaded by these arguments. We find, for several reasons, that Harten's declaration gives little or no support to them. To the extent that it tells that Travelers never conducted the elaborate inquiries and evaluations that assist in making an informed decision to insure a particular warehouse and on what terms, concerning the warehouse that burned, and that Travelers never intended to underwrite it, what Travelers did or did not do on its own in agreeing to the Policy language is irrelevant to what the Insured could reasonably understand to be the meaning of the Policy. Harten did not assert that these facts or intentions were communicated by Travelers to the Insured. *See Home Indem. Co.*, 66 N.Y.2d at 671–72.

To the extent that Harten does make statements about the contents of negotiating exchanges between Travelers and the Insured, which might be relevant to interpreting ambiguities of the Policy—such as Harten's statements that Travelers was not "asked [by the Insured] to approve the Virginia Road Warehouse," App'x at 184, and that "[t]he Virginia Road Warehouse was not a location submitted . . . [to] Travelers, which is why it falls into the classification of an 'Unnamed Domestic Location," App'x at 188—these assertions are to no effect because Harten, so far as his declaration

29

reveals, had no personal knowledge of the exchanges between Travelers and the Insured that resulted in their agreement on the Policy. App'x at 184. He is therefore not a competent witness on that subject, so that his testimony that the Insured did not request "Approved Location" status for the Virginia Road warehouse must be disregarded. *See* Fed. R. Civ. P. 56(c)(4). ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Nor did Harten's declarations include business records, which, depending on what they say, might have furnished a competent source for his contentions.

The same is true of his further assertions that Travelers "was never afforded the opportunity to underwrite the Virginia Road Warehouse." App'x at 184, 188. This assertion is similarly beyond Harten's testimonial competence because it depends on the content of exchanges between Travelers and the Insured of which Harten had no personal knowledge.

Going further, Travelers' assertion that giving Approved status to the warehouse adjacent to Virginia Road would be unreasonable and unfair to

30

Travelers because Travelers never had the opportunity to assess its insurability is also logically unpersuasive. Granting that Travelers could make a better-informed insurance decision if it knew exactly in which warehouse building or buildings the insured goods would be stored, several paths were open to it. It needed only to tell its Insured that it would grant "Approved Location" status only to an individual warehouse located at 56 Branch Street, and that, if there was a possibility that the goods would be housed in other Chamad warehouse buildings, the Insured needed to so specify or run the risk of having coverage limited to the maximum for Unnamed Locations. Alternatively, Travelers could have simply worded its Policy to make this clear. Either avenue would have given Travelers the information permitting it to make an informed assessment of the risks attending the warehouse on Virginia Road or else limit its coverage responsibility to a level it was willing to accept without investigating the additional warehouses' insurance worthiness. There is no basis for Travelers' claim that it was denied the opportunity to make an informed decision or that interpreting the Policy to cover the warehouse fronting on Virginia Road would be unfair to it.

Interpreting the Policy to include within "Approved Locations" any warehouses located at the address furnished by the Insured results solely from Travelers having written its Policy in an ambiguous manner that admits of that understanding. Travelers cannot fairly ask its insureds to bear the brunt of ambiguities that it wrote into its Policy. To the extent Travelers contends that so interpreting its Policy subjects it to unfairness, it is far less unfair than it would be for the court to rule that the Insured must bear the brunt of Travelers having misled it by presenting it with an ambiguous Policy, failing to warn that, despite the absence of anything in the Policy saying so, Approved status with its elevated limits will apply only to individually identified buildings and not to buildings reasonably identified by their collective addresses.[7]

We therefore reject Travelers' arguments based on the contention that it was denied the opportunity to assess the insurability of the warehouse

---

[7] Travelers argues, in addition, that being a large company experienced in the garment trade, the Insured should have understood that only a specifically identified warehouse would serve as an "Approved Location." The argument has no merit as Travelers submitted no evidence to support the contention that this was the custom of the trade.

fronting on Virginia Road and would be subjected to unfairness by our reading the Policy that it wrote to say what it reasonably appears to say.

## C

For such intractable circumstances, the law of New York furnishes a solution. When a contract of insurance is ambiguous and the evidence furnishes no basis for resolving the ambiguity, New York law provides that the court's decision must favor the insured over the insurer as long as the insured's interpretation is reasonable. *See, e.g.*, *Haber*, 137 F.3d at 697–98; *Thomas J. Lipton, Inc.*, 34 N.Y.2d at 361; *Int'l Bus. Machs.*, 18 N.Y.3d at 646 (citing *Breed*, 46 N.Y.2d at 353). As 56 Branch Street is the address of Chamad and of the 19.03-acre parcel on which sat the warehouse that suffered the fire, there is nothing unreasonable about the Insured's interpretation of the Policy's identification of the relevant "Approved Location" "CHAMAD WAREHOUSE, INC., 56 Branch Street" as covering the Chamad warehouse fronting on Virginia Road. Because the Insured's interpretation of an ambiguity in the Policy is reasonable and unrebutted, judgment must be awarded to the Insured.

33

It is, of course, theoretically possible that, if the case were remanded for discovery and trial, Travelers might find and present evidence that would support its contentions. But, as noted above, both parties agreed to have the court hear cross-motions for summary judgment without prior discovery proceedings. Either party could have insisted on the opportunity to take discovery before being obliged to defend against the other side's motion for summary judgment. *See* Fed. R. Civ. P 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."). Both sides instead made the strategic decision to face the other side's motion for summary judgment without discovery. As a consequence of that decision, Travelers, like the Insured, faced the risk that, if the record on the other side's motion showed the other side's entitlement to summary judgment, summary judgment would be granted, conclusively foreclosing any opportunity to take discovery. For the reasons described above, that is what the record showed. Under New York law's requirement that unresolved ambiguities in a contract

of insurance be resolved against the insurer, the Insured showed entitlement to judgment.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to Travelers is VACATED and this case is REMANDED with directions to enter judgment in favor of the Insured. Costs to the Insured.